1

2

3

4              UNITED STATES DISTRICT COURT

5            NORTHERN DISTRICT OF CALIFORNIA

6

7  WILLIAMS-SONOMA, INC.,              Case No.18-cv-07548-EDL

8            Plaintiff,

9       v.                            **ORDER DENYING DEFENDANT'S
                                        MOTION TO DISMISS**
10  AMAZON.COM, INC.,
                                       Re: Dkt. No. 23
11           Defendant.

12

13         Defendant Amazon.com, Inc. ("Amazon") moved to dismiss Plaintiff Williams-Sonoma,

14  Inc.'s ("Williams-Sonoma") claims that Amazon infringed and diluted Williams-Sonoma's service

15  mark and engaged in unfair competition through its marketing of Williams-Sonoma products for

16  resale on its website.[1]  For the reasons discussed below, the Court denies the motion to dismiss.

17  **I.      FACTUAL ALLEGATIONS**

18         Williams-Sonoma is a retailer of high-end home furnishings and related homewares.

19  Compl., ¶ 10.  Williams-Sonoma was founded in 1956 in Sonoma, California, and has since

20  expanded its presence to over 600 retail stores, catalogs, and 8 main websites.  Id., ¶¶ 12, 14.

21  Since 1956, Williams-Sonoma has invested tens of millions of dollars promoting its brand under

22  the Williams-Sonoma mark.  Id., ¶ 18.  Williams-Sonoma owns numerous trademark and service

23  mark registrations, including Reg. No. 2,353,758 covering "retail store services, mail order catalog

24  services, and on-line retail store services featuring culinary equipment, housewares, kitchenware

25  and cookware" and Reg. No. 2,410,528 for "on-line gift registry services" (the "Mark").  Id., ¶ 19,

26  Ex. A.  Williams-Sonoma sells high quality goods and devotes significant resources to product

27  ───────────────

28  [1] Amazon's motion to dismiss is not directed toward the separate claims that its Rivet line of home furnishings infringes Williams-Sonoma's design patent and its marketing of the Rivet line infringes Williams-Sonoma's common law trademarks.

United States District Court
Northern District of California

development and quality control and to providing customer service to customers of its retail channels to ensure that the goods and services they receive are consistent with the brand's prestige.  Id., ¶ 21.  It alleges that "[t]he exemplary service [Williams-Sonoma's] brands provide at retail and through e-commerce is central to [Williams-Sonoma's] business model."  Id., ¶ 16.  To protect the integrity of its brand, Williams-Sonoma does not license its Mark in connection with online retail services.  Id., ¶ 22.

Amazon is one of the world's largest online retailers.  Id., ¶ 11.  Williams-Sonoma alleges that Amazon uses the Mark to engage in the unauthorized promotion and offering of online retail services and goods.  Id., ¶¶ 24-25.  Williams-Sonoma refers to the mark that Amazon uses to sell Williams-Sonoma products on its website as the "Counterfeit Mark."  Id.  Williams-Sonoma alleges that Amazon's use of the Mark causes customer confusion because it leads customers to believe that Amazon is authorized to resell Williams-Sonoma products or is otherwise affiliated with it.  Id., ¶ 26.  On the product pages for Williams-Sonoma products that are for sale on amazon.com, the pages state that the sale of the item would be "Fulfilled by Amazon" and the term "by Williams-Sonoma" appears in blue font as a hyperlink above the product image and price.  Id.

By clicking on the "by Williams-Sonoma" hyperlink, a customer is directed to a page that displays the phrase "Shop Williams-Sonoma" in bright yellow at the top.  Id., ¶ 27.  The page uses Williams-Sonoma's own copyrighted pictures and product imagery.  Id., ¶ 28.  This "Shop Williams-Sonoma" page creates the impression that consumers are browsing a shop offered by, authorized by, or affiliated with Williams-Sonoma.  Id., ¶¶ 27-28.

Amazon also uses the Mark to prospect for sales by sending targeted emails to consumers.  Id., ¶ 29.  For example, on or about November 25, 2018, Amazon sent a marketing email to the president of the Williams-Sonoma brand, with the subject line: "Janet: Williams-Sonoma Peppermint Bark 1 Pound Tin and more items for you."  Id., ¶ 30, Ex. B.  The email referred to Amazon's ability to show "millions of our items from our vast selection at great prices," even though the specific Williams-Sonoma product advertised in the email for a price of $47.35 for a 1-pound tin is greater than the $28.95 price at which Williams-Sonoma sells the same product on its

United States District Court
Northern District of California

2

1   website.  Id., ¶ 31.

2       Amazon also purchases keywords that are nearly identical to the Mark and uses them to

3   present advertisements in search engine results.  Id., ¶ 32.  For example, in a search of the words

4   "williams sonoma" on Safari for iOS, the second search result is a paid advertisement by Amazon

5   that features "Williams & Sonoma" in a paid advertisement for "Williams & Sonoma at

6   Amazon®" at an "Amazon Official Site."  Id.

7       Finally, Williams-Sonoma alleges that the Williams-Sonoma products that Amazon sells

8   on its website are deficient in quality, damaging to the Williams-Sonoma brand, and not subject to

9   Williams-Sonoma's quality controls.  Id., ¶ 33.  Online reviews of Williams-Sonoma products that

10  are "Fulfilled by Amazon" feature complaints about higher prices than charged for the same

11  products on Williams-Sonoma's authorized websites, products delivered that do not match the

12  advertised specifications, and/or products sent broken or without necessary parts.  Id., Ex. D.

13  Williams-Sonoma further alleges that discovery is likely to show sales of a wide variety of

14  Williams-Sonoma branded products using misleading designations, including perishables that

15  cannot be delivered in a safe fashion.  Id.

16  **II.    PROCEDURAL HISTORY**

17      Williams-Sonoma filed this lawsuit on December 14, 2018, seeking damages and

18  injunctive relief in connection with its claims for: (1) infringement of U.S. Patent No. D815,452

19  for Williams-Sonoma's West Elm orb chair; (2) trademark infringement and counterfeiting in

20  violation of 15 U.S.C. § 1114(1) for use of Williams-Sonoma's trademark on Amazon's website

21  and in advertising; (3) trademark dilution in violation of 15 U.S.C. § 1125(c) for use of Williams-

22  Sonoma's trademark on Amazon's website and in advertising; (4) unfair competition in violation

23  of 15 US.C. § 1125(a); (5) common law unfair competition and trademark infringement; (6)

24  trademark dilution in violation of California Business & Professions Code § 14200 et seq. for use

25  of Williams-Sonoma's mark on Amazon's website and in advertising; and (7) unfair competition

26  in violation of California Business & Professions Code § 17200 et seq.  Amazon responded with

27  its motion to dismiss.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### III.   LEGAL STANDARD

A court may dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) when it does not contain enough facts to state a claim for relief that is plausible on its face.  A complaint will survive a motion to dismiss if it contains "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The reviewing court's "inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." Lazy Y Ranch LTD v. Behrens, 546 F. 3d 580, 588 (9th Cir. 2008).

A court need not, however, accept as true the complaint's "legal conclusions." Iqbal, 556 U.S. at 678.  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679.  Thus, a reviewing court may begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

### IV.   DISCUSSION[2]

#### A.   Service Mark Infringement

Williams-Sonoma alleges that Amazon uses a counterfeit version of its service Mark in advertisements and on its website.  Amazon responds that Williams-Sonoma has not alleged counterfeiting because it has merely alleged that Amazon uses the Mark to accurately identify legitimate Williams-Sonoma products.

A "counterfeit mark" is defined as:

(1) "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered"; or

---

[2] There is no dispute that the federal and state trademark infringement and unfair competition law claims are analyzed under the same test, so the Court has not separately analyzed those claims in this Order.  See Slep-Tone Entm't Corp. v. Wired for Sound Karaoke & DJ Servs., LLC, 845 F.3d 1246, 1249 (9th Cir. 2017) (the test for unfair competition and trademark infringement claims is "identical"); Cleary v. News Corp., 30 F.3d 1255, 1262-63 (9th Cir. 1994) ("This Circuit has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act.").

(2) "a spurious designation that is identical with, or substantially indistinguishable from, a designation as to which the remedies of this chapter are made available by reason of section 220506 of Title 36."

15 U.S.C. §1116(d)(1)(B).  Authorized use of a registered mark is not counterfeiting.  Id. ("[S]uch term does not include any mark or designation used on or in connection with goods or services of which the manufacture or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation.").  For purposes of civil remedies, the Lanham Act defines "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark."  15 U.S.C. § 1127.

Federal trademark law makes it illegal to use or counterfeit a registered mark in connection with the sale, offering for sale, distribution, or advertising of goods or services where it is likely to cause confusion in consumers.  15 U.S.C. § 1114(1).  A "service mark," such as the Mark at issue in this case, is defined as a mark used "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown."  15 U.S.C. § 1127.  Service marks are entitled to the same scope of legal protection afforded product trademarks.  Nutri/System, Inc. v. Con-Stan Indus., Inc., 809 F.2d 601, 604 (9th Cir. 1987) ("Section 1053 of the Act provides the same protection to holders of service marks and trademarks.  The Courts consistently interpret this section to mean that 'identical standards' govern trademark and service infringement cases."); 15 U.S.C. § 1053 ("[S]ervice marks shall be registrable, in the same manner and with the same effect as are trademarks, and when registered they shall be entitled to the protection provided in this chapter in the case of trademarks.").

"Often, counterfeit merchandise is made so as to imitate a well-known product in all details of construction and appearance so as to deceive customers into thinking that they are getting genuine merchandise."[3]  4 McCarthy on Trademarks & Unfair Competition § 25:10 (5th

---

[3] The complaint includes allegations that imply that the Williams-Sonoma items sold on Amazon's website were not genuine Williams-Sonoma products (see, e.g., Compl., ¶¶ 3 (Amazon uses the Mark for "putative Williams-Sonoma products"), 26 ("at the top of product pages for purported

ed.).  However, counterfeiting need not always involve the use of a trademark in connection with the sale of the counterfeiter's manufactured good that it attempts to pass off as goods made by the trademark owner, and may involve the use of service marks.  See Laukus v. Rio Brands, Inc., 391 Fed. App'x 416, 425 (6th Cir. 2010) (unpublished).

Williams-Sonoma contends that Amazon's use of the Mark in advertising and on amazon.com to re-sell Williams-Sonoma products constituted the use of a counterfeit mark because the use was unauthorized.  A mark is counterfeit if: (1) "it was a non-genuine mark identical to" the Mark; (2) the Mark "was registered on the Principal Register for use on the same [services] to which" Amazon applied the mark; (3) the Mark "was in use"; and (4) Amazon "was not authorized to use" the Mark to sell Williams-Sonoma's goods online.  See State of Idaho Potato Comm'n v. G&T Terminal Packaging, Inc., 425 F.3d 708, 721 (9th Cir. 2005).  Amazon does not argue that Williams-Sonoma has failed to plead the elements of a counterfeit mark as set forth in State of Idaho Potato Comm'n.[4]  "It is now well-settled that trademark infringement occurs when a defendant uses the plaintiff's trademark in a manner that suggests that the defendant is affiliated with the plaintiff's company even though the defendant deals in the goods of the trademark owner."  Stormor, a Div. of Fuqua Indus., Inc. v. Johnson, 587 F. Supp. 275, 278 (W.D. Mich. 1984) (citations omitted).

The question of whether the challenged conduct constitutes counterfeiting therefore turns on whether Amazon's use of the Mark was likely to cause confusion.  Id.  Likelihood of confusion in a trademark infringement action is determined based on the "reasonably prudent consumer" and "[w]hat is expected of this reasonably prudent consumer depends on the circumstances."  Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1060 (9th Cir. 1999).  It

---

Williams-Sonoma products for sale on the <amazon.com> platform")), but the complaint does not specifically allege that the products offered for sale were not genuine.  Williams-Sonoma also does not dispute that it originally manufactured the products.

[4] There are several allegations in the complaint that Amazon uses marks that are highly similar to but not exactly the same as the registered Williams-Sonoma Mark.  At times, Amazon uses "Williams Sonoma" without the hyphen or "Williams & Sonoma" using an ampersand that does not appear in the registered Mark.  Neither side, however, has argued that these marks are not sufficiently similar for purposes of pleading use of a counterfeit mark.

United States District Court
Northern District of California

is expected that a consumer will "be more discerning – and less easily confused – when he is purchasing expensive items" and vice versa.  <u>Id.</u>  Williams-Sonoma's allegations of consumer confusion as a result of implied affiliation are discussed below.

### B.    First Sale Doctrine

Regardless of Williams-Sonoma's allegations of counterfeiting, Amazon asserts the defense that its reselling of Williams-Sonoma goods under the Mark is protected by the "first sale" or "exhaustion" doctrine and, thus, cannot constitute trademark infringement.  "[C]ourts have recognized a basic limitation on the right of a trademark owner under the Lanham Act to control the distribution of its own products."  <u>Sebastian Int'l, Inc. v. Longs Drug Stores Corp.</u>, 53 F. 3d 1073, 1074 (9th Cir. 1995).  "[W]ith certain well-defined exceptions, the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product. Resale by the first purchaser of the original article under the producer's trademark is neither trademark infringement nor unfair competition."  <u>Id.</u>  "[T]he 'first sale' rule preserves an area for competition by limiting the producer's power to control the resale of its product."  <u>Id.</u> at 1075. Significantly, the first sale doctrine is not "rendered inapplicable merely because consumers erroneously believe the reseller is affiliated with or authorized by the producer."  <u>Id.</u> at 1076.  At the same time, the protection of the doctrine is limited to "a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark . . . "  <u>Id.</u>[5]

Since the complaint does not directly allege that the Williams-Sonoma items sold on Amazon's website were not genuine and Williams-Sonoma did not raise this argument, Amazon

---

[5] The parties did not brief the issue, but there is some dispute over whether the first sale doctrine applies when a service mark is at issue because "[u]nlike goods, which can be sold and resold without change to their nature, quality, and genuineness, services such as gymnastics and fitness instruction inherently vary depending on who is providing such services."  <u>Tumblebus Inc. v. Cranmer</u>, 399 F. 3d 754, 766-67 (6th Cir. 2005); <u>cf.</u> <u>Stevo Design, Inc. v. SBR Mktg. Ltd.</u>, 919 F. Supp. 2d 1112, 1122 (D. Nev. 2013) (the first sale doctrine applies to service marks "at least where the service can be sold and resold without change to its 'nature, quality, and genuineness'") (quoting <u>Tumblebus</u>, 399 F. 3d at 766).  The Ninth Circuit has not drawn such a distinction to date, and the service at issue here – the resale of goods on a website – may not be as inherently variable as the service of fitness training on a mobile gym/bus at issue in <u>Tumblebus</u>.  Even if the Court were to apply this line of cases, however, the result would appear to be the same because it is likely that Williams-Sonoma has adequately pleaded that Amazon provided services covered by the Mark that were different.

United States District Court
Northern District of California

contends that the allegations against it amount to no more than truthful advertising that it sells Williams-Sonoma products on the "Amazon Official Site," which is protected by the first sale doctrine.  There is no doubt that "[a] retailer can use a brand name on Web site ads selling that branded product without a license from the trademark owner."  Vivo Per Lei, Inc. v. Bruchim, 2012 WL 13008731, at *3 (C.D. Cal. Apr. 2, 2012) (quoting 4 McCarthy on Trademarks and Unfair Competition, § 25:41 at 25-111) (5th ed.)).  Thus, Amazon would be correct if that were all that Williams-Sonoma alleged because "[w]hile a trademark conveys an exclusive right to the use of a mark in commerce in the area reserved, that right generally does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the product."  Tiffany (NJ) Inc. v. eBay, Inc., 600 F.3d 93, 102-03 (2d Cir. 2010) (internal quotation omitted).  Williams-Sonoma counters that it has adequately alleged that Amazon does more than merely "stock[ ] and resell[ ]" its products and creates confusion over affiliation.

First, Williams-Sonoma contends that Amazon has essentially set up an unauthorized Williams-Sonoma website on the amazon.com platform.  It points to the allegation that Amazon maintains a centralized page of Williams-Sonoma products under the heading "Shop-Williams Sonoma" in a bright yellow header, often using Williams-Sonoma's own product images.  Compl., ¶¶ 27-28.  As compared to a reseller's own photographs of the products, using Williams-Sonoma's pictures suggests that it may be involved in the product listings.  Williams-Sonoma further argues that the implication that Williams-Sonoma is directly offering these products for sale on amazon.com is reinforced by the product pages themselves where the items are listed as "by Williams-Sonoma" or "from Williams-Sonoma."  Id., ¶¶ 26-27.  Second, Williams-Sonoma argues that Amazon's targeted advertising emails and search engine advertising are likely to further confuse consumers.  It contends that Amazon's advertisements suggest that Williams-Sonoma has authorized sales of its products on amazon.com because they tell potential customers that they can "[b]uy Williams & Sonoma" at the "Amazon Official Site" at amazon.com and the links included in the advertisements direct consumers to the "Shop Williams-Sonoma" page on amazon.com.  Id., ¶ 32.

United States District Court
Northern District of California

8

The first theory of infringement – that Amazon set up an unauthorized Williams-Sonoma website – is not plausible.  The screenshots included in the complaint and/or attached as exhibits show that the Amazon logo and search bar are at the top of the product pages and the "Shop Williams-Sonoma" page prominently displays the Amazon logo, ask users to "Try Prime" (a well-known Amazon service), and contain the phrase "Your Amazon.com" at the top.  Under these circumstances, it is not plausible that consumers would be unaware that they were visiting an Amazon website and not a Williams-Sonoma website.  Amazon's alleged use of the Mark on its website is a far cry from the more old fashioned and egregious alleged infringement in Trader Joe's Co. v. Hallatt, 835 F.3d 960 (9th Cir. 2016), which Williams-Sonoma relied upon heavily. There, Trader Joe's alleged that a Canadian citizen drove down to Trader Joe's stores on the west coast to buy Trader Joe's-branded products in bulk and resold them at higher prices and with less quality control for perishables at a store in Canada that used Trader Joe's trade dress which he called Pirate Joe's in a swashbuckling touch.  Id. at 963-65.  Trader Joe's sued him for trademark infringement and dilution, among other claims.  Id. at 965.  The Ninth Circuit's opinion addressed the question of extraterritoriality of the Lanham Act and did not directly resolve the merits of the trademark claims, although the merits issues, including application of the first sale doctrine, played a role in the extraterritoriality analysis.  Id. at 966.  The merits discussion there would be more applicable here if, for example, Amazon allegedly sold Williams-Sonoma products not online but in Amazon's physical stores like its Whole Foods chain, rebranded under a variation of the Williams-Sonoma name and displaying its trade dress, raising prices while spoiling the perishable goods across the board.

Nonetheless, drawing all inferences in favor of Williams-Sonoma as the Court must do at this stage, Amazon's various alleged uses of the Williams-Sonoma Mark in combination plausibly suggest an affiliation with Williams-Sonoma that does not actually exist.  It is a close call but on balance the allegations raise the plausible inference that Amazon is not merely reselling Williams-Sonoma products, but is instead cultivating the incorrect impression that these sales on amazon.com are authorized by Williams-Sonoma and that a reasonably prudent consumer is likely to be confused.  Sebastian, 53 F.3d at 1076; see also Australian Gold, Inc. v. Hatfield, 436 F.3d

1228, 1241 (10th Cir. 2006) ("[T]he first sale doctrine does not protect resellers who use other entities' trademarks to give the impression that they are favored or authorized dealers for a product when in fact they are not.").

Starting from the likely beginning of a consumer's shopping experience, Amazon sponsors search engine advertisements that inform the consumer that it can "[b]uy Williams & Sonoma" at an "Amazon Official Site":



Compl., ¶ 32.  The use of the term "Amazon *Official* Site" is arguably unnecessary to identify the site as Amazon's since it is situated next to an amazon.com link and adjacent to several other Amazon or amazon.com references.  Since the consumer is already on notice that the advertised link will take it to the official Amazon website, use of the term "Amazon Official Site" in the context of an advertisement for the sale of Williams-Sonoma products may plausibly suggest that Amazon has permission to sell those products.  "In the keyword advertising context the likelihood of confusion will ultimately turn on what the consumer saw on the screen and reasonably believed, given the context." Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1154 (9th Cir. 2011) (internal quotation and citation omitted).  The Ninth Circuit has explained that the observation in Brookfield, 174 F.3d at 1054, that "[i]nternet users on the whole exercise a low degree of care," may no longer be accurate in many situations, even if correct in 1999.  638 F.3d at 1153 ("While the statement may have been accurate then, we suspect that there are many contexts in which it no longer holds true.").  Thus, Amazon's advertisements and their surrounding context are just one relevant factor for the analysis of the likelihood of confusion.  Id. at 1154.  While "[c]onsumers who use the internet for shopping are generally quite sophisticated about such matters," the level of sophistication of particular shoppers still varies based on the

1    expense of the products for which they are shopping.  Id.

2       Once on Amazon's website, consumers can peruse a centralized page of Williams-Sonoma

3    products that are offered for sale on a webpage labeled "Shop Williams-Sonoma" in a bright

4    yellow header:



   Compl., ¶ 27 (circles and arrows added by Williams-Sonoma).  The products listed on this

   centralized website often use Williams-Sonoma's own product images that one would likely

   encounter on Williams-Sonoma's own website or in its catalogues.  While Amazon's product

   listings do not display Williams-Sonoma's product trademark or trade dress, the use of Williams-

   Sonoma's pictures, as opposed to a reseller's own pictures of the products, may plausibly suggest

   that Williams-Sonoma is involved in the product listings.  Nothing on this centralized webpage

   explicitly informs consumers that Amazon does not have an official relationship with Williams-

   Sonoma or explains that the products are offered for sale by unauthorized third parties.  While not

   required as a matter of law, such a disclaimer would dispel that inference of likely confusion.  See

   Toyota Motor Sales, U.S.A., Inc. v. Tabari, 610 F.3d 1171, 1177 (9th Cir. 2010) ("The inclusion

   of [words such as 'independent' that disclaim affiliation] will usually negate any hint of

   sponsorship or endorsement, which is why we mentioned them in concluding that there was no

   infringement in Volkswagenwerk.  But that doesn't mean such words are required, and

   Volkswagenwerk doesn't say they are.  Our subsequent cases make clear they're not.").

United States District Court
Northern District of California

1    After a consumer identifies a product of interest and clicks on a product link, the consumer

2 is directed to the product page where the product can be purchased.  At the top of the product

3 page, the products are generally identified as, for example, "Williams-Sonoma Classic Striped

4 Dishclothes, Jojoba Yellow":



Compl., ¶ 26 (circles and arrows added by Williams-Sonoma).  Directly below that description,

the product page states that the item is "by Williams-Sonoma."  Since the item is already

identified in the description as a Williams-Sonoma product, the inclusion of the "by Williams-

Sonoma" link plausibly could imply that the product is sold by Williams-Sonoma or at least

authorized by it for sale by Amazon.  While the product page also states on the same page and in

the same size and color font, albeit off to the right-hand side, that the item is "Sold by" an

identified third party and "Fulfilled by Amazon," the addition of these statements may still leave

the consumer uncertain about the role of Williams-Sonoma in light of the "by Williams-Sonoma"

statement in the product description and the otherwise official look of the product imagery and

description of the product details, including "A Williams Sonoma exclusive."

The allegations also plausibly support a claim that Amazon's search engine advertisements

and their use of the Mark generate initial interest confusion.  Initial interest confusion "results

when a consumer seeks a particular trademark holder's product and instead is lured to the product

of a competitor by the competitor's use of the same or a similar mark." Australian Gold, 436 F.3d at 1238 (citations omitted). "Even though the consumer eventually may realize that the product is not the one originally sought, he or she may stay with the competitor. In that way, the competitor has captured the trademark holder's potential visitors or customers." Id.; see also Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1018 (9th Cir. 2004) ("Initial interest confusion occurs when the defendant uses the plaintiff's trademark 'in a manner calculated to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion.'") (internal quotation and citation omitted). As alleged in the complaint, Amazon's advertisements not only describe its affiliation with Williams-Sonoma in a potentially misleading fashion, but also divert consumers away from Williams-Sonoma's authorized sales channels and toward Amazon's website. Cf. Stevo Design, 919 F. Supp. 2d at 1122-23 (the first sale doctrine did not create initial interest confusion or ordinary confusion over the defendant's affiliation with the plaintiff by using the plaintiff's mark plus the word "pick" in Google search results because there were no allegations that the defendant held itself out in anyway, including through the purchase of search engine keywords incorporating the marks, as connected to the plaintiff).

Finally, Williams-Sonoma makes allegations of actual consumer confusion over Williams-Sonoma's role in selling the products on Amazon's website. For example, the complaint alleges that "on November 5, 2018, a customer at a Williams-Sonoma branded retail store informed a [Williams-Sonoma] employee that the customer was appalled that [Williams-Sonoma] would sell its products on Amazon for double the price [Williams-Sonoma] charges in its Williams-Sonoma branded stores." Compl., ¶ 36. Actual consumer confusion is not dispositive of the issue because the first sale doctrine "is not rendered inapplicable merely because consumers erroneously believed the reseller is affiliated with or authorized by the producer." Sebastian, 53 F.3d at 1076. Nonetheless, in combination with the other allegations, this one supports the conclusion that the complaint plausibly alleges conduct on Amazon's part that vitiates the first sale doctrine.

The cases that Amazon relies upon are distinguishable. Tiffany (NJ) Inc. v. eBay, Inc., 600 F.3d 93 (2d Cir. 2010) held that eBay's use of the Tiffany mark on its website and in sponsored links was lawful because the mark was used "to describe accurately the genuine Tiffany

13

goods offered for sale on its website.  And none of eBay's uses of the mark suggested that Tiffany affiliated itself with eBay or endorsed the sale of its products through eBay's website." Id. at 103. One such sponsored-link advertisement stated: "Tiffany on eBay.  Find tiffany [sic] items at low prices.  With over 5 million items for sale every day, you'll find all kinds of unique [unreadable] Marketplace.  www.ebay.com." Id. at 101.  Significantly, eBay's "About Me" page explained that "[m]ost of the purported 'TIFFANY & CO.' silver jewelry packaging available on eBay is counterfeit" and that Tiffany only sells its products through its own stores, catalogues, and website. Id.  Unlike eBay, here Amazon did not make any express disclaimers to distance itself from the items being sold.  Second, eBay is well-known as a marketplace exclusively for resale items, whereas Amazon sells both new and resale items.  It is unlikely that the average consumer would be confused about advertisements for Tiffany jewelry on eBay into believing that the jewelry is authorized by Tiffany to be sold on eBay.  The role of the original manufacturer of products that are sold on amazon.com is less clear.

Hart v. Amazon.com, Inc., 191 F. Supp. 3d 809 (N.D. Ill. 2016) involved the claims of a single self-published author and third-party sales of his book on Amazon's website. Id. at 814, 816.  In granting the defendant's motion to dismiss, the court concluded that the first sale doctrine barred the Lanham Act claim because the plaintiff did not plausibly allege that the defendant counterfeited his book and sold it on the website rather than Amazon merely reselling a genuine, unaltered product.  There were no specific allegations supporting the conclusory claim that unauthorized third-party sales of his book on amazon.com would likely confuse consumers about whether the plaintiff endorsed those sales. Id. at 818.  The court also concluded that the allegation that the books were being sold on amazon.com would not plausibly confuse a consumer into thinking that Amazon endorsed the book. Id. at 819.  Williams-Sonoma's claims are distinguishable not only because it is a major retailer whose sought-after goods are being re-sold on Amazon's website, with several references to "Williams-Sonoma" set forth in far more detailed allegations than the Plaintiff's in Hart, but also because this case concerns the services that are provided to consumers under Williams-Sonoma's service mark and only indirectly involves the actual goods sold.

14

1      The allegations in this case are also distinguishable from <u>Multi Time Machine, Inc. v.</u>

2   <u>Amazon.com, Inc.</u>, 804 F.3d 930 (9th Cir. 2015).  There, the Ninth Circuit affirmed summary

3   judgment of no trademark infringement where Amazon responded to a customer search for "mtm

4   special ops," a type of watch manufactured by the plaintiff, and the search results accurately

5   showed that it did not carry the plaintiff's brand and offered a list of other brands it did carry.  <u>Id.</u>

6   at 935-36.  The issue was the design of the web page, as the search results page displayed the

7   search term used ("mtm special ops") followed by a display of numerous watches manufactured

8   by the plaintiff's competitors without expressly telling the customer that Amazon did not carry

9   "mtm" watches.  <u>Id.</u> at 936-37.  The court concluded that there was undisputed evidence that

10   confusion on the part of an inquiring buyer was "not likely at all."  <u>Id.</u> at 936.

11      Not only is this case in an earlier procedural posture than <u>Multi Time Machine</u>, so that the

12   Court is limited to the complaint's allegations and does not have the benefit of an evidentiary

13   record, but the conduct at issue is qualitatively different.  Here, Amazon is alleged to have taken

14   steps that go beyond stating that a product is or is not sold on its website.  In this respect, this case

15   is more akin to <u>Bandag, Inc. v. Al Bolser's Tire Stores, Inc.</u>, 750 F.2d 903 (Fed. Cir. 1984) and

16   <u>Stormor</u>, 587 F. Supp. 275, where the defendants' use of the plaintiffs' trademarks in

17   advertisements, promotional materials, and trade show booths made it appear that the defendants

18   were the plaintiffs' affiliates or franchisees.  Moreover, <u>Multi Time Machine</u> recognized that

19   "[c]onfusion is less likely where buyers exercise care and precision in their purchases, such as for

20   expensive or sophisticated items," such as the watches at issue that sold for several hundred

21   dollars.  <u>Multi Time Machine</u>, 804 F.3d at 937 (quoting <u>Au-Tomotive Gold, Inc. v. Volkswagen of</u>

22   <u>Am., Inc.</u>, 457 F.3d 1062, 1076 (9th Cir. 2006)).  By contrast, the Williams-Sonoma goods sold on

23   Amazon are generally less expensive (the dishtowels at $39.99, and even the candy resold at

24   $47.35 rather than $28.95, <u>see</u> Compl., ¶¶ 26, 31)), so the relevant customers are less sophisticated

25   and pay less attention to the details of their purchases.  This increases the likelihood of confusion.

26   At this stage of the proceedings, Plaintiffs' allegations are probably sufficient to plausibly state an

27   infringement claim to which the first sale doctrine does not apply.

28      Williams-Sonoma argues in the alternative that even if the complaint contains allegations

United States District Court
Northern District of California

1    that plausibly claim that the first sale doctrine would otherwise apply, it does not insulate Amazon

2    from liability because it forfeits that protection under the quality control exception.  See Enesco

3    Corp. v. Price/Costco Inc., 146 F.3d 1083 (9th Cir. 1998).  "Under the quality control theory,

4    largely developed by the Second Circuit, '[d]istribution of a product that does not meet the

5    trademark holder's quality control standards may result in the devaluation of the mark by

6    tarnishing its image." Enesco Corp. v. Price/Costco Inc., 146 F.3d 1083, 1087 (9th Cir. 1998)

7    (quoting Warner-Lambert Co. v. Northside Dev. Corp., 86 F.3d 3, 6 (2d Cir. 1996)).  "If this

8    occurs, 'the non-conforming product is deemed for Lanham Act purposes not to be the genuine

9    product of the holder, and its distribution constitutes trademark infringement.'"  Id.

10    With respect to quality control, the complaint alleges that: (1) the goods and services sold

11    under the Mark are "high quality" and that Williams-Sonoma "devotes an enormous amount of

12    resources to product development and quality control and to providing customer service to

13    customers of its retail channels, all to ensure that the goods and services it offers are reflective of,

14    and consistent with, its brand's prestige" (Compl., ¶ 21); (2) "[t]he services Amazon offers under

15    the Counterfeit Mark to consumers also appear to be deficient in quality and damaging to the

16    Williams-Sonoma brand" (id., ¶ 33); and (3) the products Amazon sells "are not subject to

17    [Williams-Sonoma's] quality controls" (id., ¶ 3).  While these allegations are not very detailed,

18    they do provide reinforcement for Williams-Sonoma's argument that it has sufficiently alleged

19    infringement, both because the first sale doctrine does not apply and because, even if it did, it is

20    subject to the quality control exception.

21    As a threshold matter, the parties dispute whether the complaint alleges the type of defects

22    that are the concern of the quality control exception.  In Enesco, the Ninth Circuit noted that

23    "[c]ourts have recognized the quality control argument in trademark infringement cases where

24    there is 'some defect (or potential defect) in *the product itself* that the customer would not be

25    readily able to detect." Enesco, 146 F.3d at 1087 (quoting Matrix Essentials, Inc. v. Emporium

26    Drug Mart, Inc., 988 F.2d 587, 591 (5th Cir. 1993)) (emphasis in Matrix).  The Ninth Circuit did

27    not expressly hold that the quality control exception to the first sale doctrine is limited to physical

28    product defects and other courts have recognized a broader "material differences" test under which

United States District Court
Northern District of California

1   a good is materially different from the original product if the difference "is one that consumers

2   consider relevant to a decision about whether to purchase a product."  Davidoff & CIE, S.A. v.

3   PLD Int'l Corp., 263 F.3d 1297, 1302 (11th Cir. 2001).  The Eleventh Circuit has explained that

4   "[b]ecause a myriad of considerations may influence consumer preferences, the threshold of

5   materiality must be kept low to include even subtle differences between products."  Id. (citing

6   Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc., 982 F.2d 633, 641 (1st Cir. 1992) and

7   Iberia Foods Corp. v. Romeo, 150 F.3d 298, 304 (3d Cir. 1998)).  "A guiding principle in

8   evaluating whether a difference between two products bearing the same trademark is material is

9   whether the difference 'confuses consumers and impinges on the . . . trademark holder's

10   goodwill.'"  Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC, 562 F.3d 1067, 1073

11   (10th Cir. 2009) (quoting Nestle, 982 F.2d at 638).

12         Williams-Sonoma has alleged that certain products sold on Amazon were either sold for

13   higher prices than they were sold by Williams-Sonoma, did not match the specifications

14   advertised (e.g., the consumer received a 16-ounce bottle of soap rather than a 20-ounce bottle of

15   soap), were received broken (e.g., a broken hot chocolate maker), or were sent without necessary

16   parts (e.g., a soap dispenser without a pump).  Only the broken products arguably fall within the

17   quality control test set forth in Enesco, provided that inferior quality control, such as poor

18   repackaging by the seller, caused the breakage and was not disclosed to the consumer.  See

19   Enesco, 146 F.3d at 1087 (holding that the quality control exception did not apply where the

20   buyers of chipped porcelain figurines were on notice that the figurines were repackaged by the

21   distributor and the repackaging was the cause of chipping).  While Amazon argues that that the

22   cause of the breakage was disclosed through its statement on the product page that the item is

23   "[f]ulfilled by Amazon," that disclosure does not give sufficient notice to offset the likelihood of

24   consumer confusion about the source of the product defect.

25         Williams-Sonoma also persuasively argues that the Enesco product defect test should be

26   extended to Amazon's provision of services under Williams-Sonoma's service mark and that all of

27   the alleged defects may be attributed to defects in the services that are provided to consumers who

28   buy Williams-Sonoma products on Amazon from third-party sellers.  Since Williams-Sonoma has

alleged infringement of its service mark and not its product trademark, alleged defects in Amazon's provision of online retail services are most relevant to the quality control exception.  As noted above, the law of trademark does not distinguish between product trademarks and service marks.  It is plausible that defects in Amazon's services caused the alleged problems with the products sold on Amazon because it does not maintain the same high level of customer and operational services in reselling the Williams-Sonoma products that Williams-Sonoma does.  Amazon has not argued that the alleged product issues and/or deficiencies in the services it renders do not meet the "material differences" test that is applied in other circuits.  The examples of the discrepancy between the size of the soap bottle that was advertised versus the one shipped and the soap bottle that was shipped with a missing pump make it plausible that these differences would confuse consumers when Amazon uses Williams-Sonoma's service mark in a way that suggests affiliation and harm consumers' goodwill for Williams-Sonoma.

While Williams-Sonoma could likely provide more detailed allegations regarding its specific quality control measures such that it avoids the mishaps alleged in Amazon's marketplace, further exercises in pleading would add little to advance the case and not serve the goals of Federal Rule of Civil Procedure 1 ("just, speedy, and inexpensive").  The proof issues for both avenues to address the merits of the first sale doctrine will overlap very substantially, if not virtually completely.

### C.    Dilution Claim

Williams-Sonoma also asserts trademark dilution.  The Lanham Act renders liable any person who uses a mark that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such persons with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1)(A).  The statute provides protection against dilution of famous marks:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark . . .

15 U.S.C. § 1125(c)(1); see also id. § 1125(c)(5) (making additional remedies available for dilution).  "Traditionally, courts have recognized two forms of dilution: blurring and tarnishment." Playboy Enters., Inc. v. Welles, 279 F.3d 796, 805 (9th Cir. 2002).  "Blurring occurs when another's use of a mark creates 'the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product.'  Tarnishment, on the other hand, occurs 'when a famous mark is improperly associated with an inferior or offensive product or service.'"  Id. (quoting Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316, 1326 n.7 (9th Cir.1998)).  "Dilution works its harm not by causing confusion in consumers' minds regarding the source of a good or service, but by creating an association in consumers' minds between a mark and a different good or service."  Id.  (citation omitted).  In other words, the dilution theory was meant to combat the problem of free riding.  Id.

Amazon argues that Williams-Sonoma's dilution claim fails as a matter of law because it only alleges that Amazon uses the mark in connection with the sale of genuine Williams-Sonoma-manufactured goods.  Williams-Sonoma responds that "[t]o find dilution, a court need not rely on the traditional definitions such as 'blurring' and 'tarnishment.'"  Panavision, 141 F.3d at 1326. What is required is a finding that Amazon's "conduct diminished the capacity of the . . . marks to identify and distinguish [Williams-Sonoma's] goods and services on the Internet."  Id. (internal citation and quotation omitted).  Williams-Sonoma has alleged that Amazon provides inferior services, such as facilitating the sale and shipment of incomplete or broken items, thereby harming Williams-Sonoma's reputation for high-quality services.  This alleged conduct falls within the bounds of dilution by tarnishment.  Thus, Williams-Sonoma's allegations adequately state a claim for tarnishment.

### D.   Willfulness Allegations

Even if the Court permits the trademark-related claims to proceed, Amazon asks the Court to dismiss Williams-Sonoma's allegations that Amazon's use of the Mark was willful, which are not a separate claim but a predicate for enhanced damages.  Williams-Sonoma contends that the proper procedural vehicle for excluding the willfulness allegations is a motion to strike, not a motion to dismiss.  A motion to strike is used to remove material in a pleading that is "redundant,

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

immaterial, impertinent, or scandalous," and such motions are generally disfavored because they "may be used as [a] delaying tactic[ ] and because of the strong policy favoring resolution on the merits." Fed. R. Civ. P. 12(f); Petrie v. Elec. Game Card, Inc., 761 F.3d 959, 966-67 (9th Cir. 2014); Barnes & AT&T Pension Ben. Plan-Nonbargained Program, 718 F. Supp. 2d 1167, 1170 (N.D. Cal. 2010). Williams-Sonoma is likely correct that the proper vehicle is a motion to strike, although courts have entertained both kinds of challenges to willfulness allegations. Even if the Court were to entertain the motion, the Court would decline to strike the willfulness allegations at this early stage of litigation.

The complaint makes the following allegations that are specific to willfulness:

- "Amazon's acts are willful, with the deliberate intent to trade on the goodwill of WSI's WILLIAMS-SONOMA Mark, cause confusion and deception in the marketplace, and divert customers of WSI's services to Amazon." Compl., ¶ 37;
- "Amazon's actions demonstrate an intentional, willful, and malicious intent to trade on the goodwill associated with Plaintiff's WILLIAMS-SONOMA Mark and to cause dilution of that mark, which has and will cause great and irreparable injury to WSI." Id., ¶ 95;
- "Defendant has engaged in a pattern of willful and intentional acts designed to appropriate WSI's prestige and goodwill, including without limitation, by copying WSI's products and trademarks." Id., ¶ 106;
- "Defendant's conduct is unlawful, unfair and deceptive in violation of California law, and is deliberate, willful and intended to confuse." Id., ¶ 108;
- "Defendant has engaged in a pattern of willful and intentional acts designed to appropriate WSI's prestige and goodwill, including without limitation, by copying WSI's products, trademarks, and registered service marks." Id., ¶ 117.

Of course, the more detailed factual allegations addressed at length above must also be considered.

"Willful infringement carries a connotation of deliberate intent to deceive. Courts generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct that meets this standard." Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F.2d 1400, 1406 (9th Cir. 1993) (on appeal regarding award of damages after trial), *abrogated on other grounds*, SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd., 839 F.3d 1179 (9th Cir. Oct. 24, 2016). "Infringement is not willful if the defendant 'might have reasonably thought that its proposed usage was not barred by the statute.'" Blockbuster Videos, Inc. v. City of Tempe, 141 F.3d 1295,

1    1300 (9th Cir. 1998) (discussing attorneys' fees for willful trademark infringement under the

2    Lanham Act).  A party's conduct meets this standard when it acts with "an aura of indifference" to

3    another's rights under a trademark.  Yelp Inc. v. Catron, 70 F. Supp. 3d 1082 (N.D. Cal. 2014)

4    (citing Philip Morris USA Inc. v. Liu, 489 F. Supp. 2d 1119, 1123 (C.D. Cal. 2007), which relied

5    on Louis Vuitton S.A. v. Lee, 875 F.2d 584, 590 (7th Cir. 1989) and Hard Rock Cafe Licensing

6    Corp. v. Concession Servs., 955 F.2d 1143, 1149 (7th Cir. 1992)); Microsoft Corp. v. E & M

7    Internet Bookstore, Inc., 2008 WL 191346, at *3 (N.D. Cal. Jan. 22, 2008) (citing Louis Vuitton,

8    875 F.2d at 590).

9        There is a significant question to whether Amazon could have acted willfully as a matter of

10   law because there is no case law that is precisely on point with the type of service trademark

11   infringement alleged in this case, and because it is a close question whether these claims are viable

12   in light of the first sale doctrine.  Therefore, Amazon raises a significant question whether it might

13   have reasonably thought its conduct was legal.  At the same time, the willfulness case law in the

14   trademark context does not speak to "clearly established" illegal conduct as in the context, for

15   example, of qualified immunity.  Cf. White v. Pauly, __ U.S. __, 137 S. Ct. 548, 551 (2017)

16   ("existing precedent must have placed the statutory or constitutional question beyond debate")

17   (internal citation and quotations omitted).  And it would not be plausible to presume that Amazon

18   conducted its marketing of Williams-Sonoma's products without some careful aforethought

19   (whether consciously in the traditional sense or via algorithm and artificial intelligence).  At a

20   minimum, Williams-Sonoma has sufficiently alleged that Amazon acted with an "aura of

21   indifference" to its rights under the Mark in deliberately using the Mark in advertisements and the

22   content of webpages to imply a non-existent affiliation with Williams-Sonoma.  The Court denies

23   Amazon's motion to dismiss the willfulness allegations.

24   **V.    CONCLUSION**

25       For the reasons discussed above, Amazon's motion to dismiss the trademark‑related claims

26   is denied.

27       //

28       //

United States District Court
Northern District of California

21

1      **IT IS SO ORDERED.**

2   Dated: May 2, 2019

3

4

5                                   ELIZABETH D. LAPORTE
                                    United States Magistrate Judge

United States District Court
Northern District of California