DURIE TANGRI LLP
DARALYN J. DURIE (SBN 169825)
ddurie@durietangri.com
MARK A. LEMLEY (SBN 155830)
mlemley@durietangri.com
JOSEPH C. GRATZ (SBN 240676)
jgratz@durietangri.com
MATTHAEUS MARTINO-WEINHARDT (SBN 313103)
mweinhardt@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:    415-362-6666
Facsimile:     415-236-6300

DURIE TANGRI LLP
ALLYSON R. BENNETT (SBN 302090)
abennett@durietangri.com
PETER S. HORN (SBN 321358)
phorn@durietangri.com
953 East 3rd Street
Los Angeles, CA 90013
Telephone:    213-992-4499
Facsimile:     415-236-6300

Attorneys for Defendant
AMAZON.COM, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WILLIAMS-SONOMA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM, INC.,<br><br>Defendant. | Case No. 3:18-cv-07548-AGT<br><br>**DEFENDANT AMAZON.COM, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:    June 26, 2020<br>Time:    10:00 a.m.<br>Ctrm:    A – 15th Floor<br>Judge:   Honorable Alex G. Tse |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>NOTICE OF MOTION AND MOTION TO DISMISS</u>

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 26, 2020 at 10:00 a.m. in Courtroom A on the 15th floor of the above court, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Amazon.com, Inc. ("Amazon"), by and through its attorneys of record, will and hereby does, move the Court pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the Eleventh Claim of Plaintiff Williams-Sonoma, Inc.'s second amended and supplemental complaint for failure to state a claim upon which relief can be granted.  This motion is based on the pleadings and papers on file in this action, the following memorandum of points and authorities, and any further papers, evidence or argument as may be submitted in connection with this motion.

1

<u>**TABLE OF CONTENTS**</u>

2

I.      INTRODUCTION .................................................................................................................1

3

II.     FACTUAL BACKGROUND ..............................................................................................2

4

III.    ARGUMENT .......................................................................................................................3

5

        A.      WSI Has Not Pled Direct Infringement. ....................................................................3

6

                1.      Using an algorithm to automatically make photographs submitted by users
                        publicly available is not volitional conduct. ...........................................................4

7

8

                2.      Amazon does not directly infringe WSI's copyrights in user-submitted
                        photographs merely because different user-submitted photographs were
                        automatically blocked. ..............................................................................................5

9

10

                        a.      That Amazon, through its algorithms, has some effect on what
                                photographs users display on product detail pages does not mean
                                that Amazon, as opposed to its users, is the one copying and
                                displaying WSI's images. ............................................................................5

11

12

                        b.      Performing a gatekeeping function like the one WSI alleges here is
                                not volitional conduct. ................................................................................8

13

14

                3.      Courts have repeatedly rejected claims that automated conduct is volitional
                        merely because similar conduct would be volitional conduct if engaged in
                        by human beings. ......................................................................................................9

15

16

                4.      WSI's arguments would eviscerate the distinction between direct and
                        secondary copyright liability......................................................................................11

17

        B.      Amazon's Alleged Conduct Falls Within the DMCA Safe Harbor for Material
                Stored at the Direction of Users..................................................................................12

18

IV.     CONCLUSION....................................................................................................................16

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Broad. Cos., Inc. v. Aereo, Inc.*,
573 U.S. 431 (2014)............................................................................................3, 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................3

*Bell Atlantic Co. v. Twombly*,
550 U.S. 544 (2007)...................................................................................................3

*BWP Media USA, Inc. v. Clarity Digital Grp., LLC*,
820 F.3d 1175 (10th Cir. 2016) ..............................................................................14

*Cartoon Network LP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008).........................................................................7, 10, 11

*CoStar Grp., Inc. v. LoopNet, Inc.*,
373 F.3d 544 (4th Cir. 2004) ....................................................................................9

*Disney Enters., Inc. v. Hotfile Corp.*,
798 F. Supp. 2d 1303 (S.D. Fla. 2011) ...................................................................10

*Distribuidora De Discos Karen C. Por A. v. Guerra Seijas*,
No. 13CIV. 5200 NRB, 2015 WL 4496066 (S.D.N.Y. Mar. 26, 2015) .................15

*Fox Broad. Co. v. Dish Network L.L.C.*,
747 F.3d 1060 (9th Cir. 2014) ........................................................................6, 7, 8

*Fox Broad. Co. v. Dish Network, L.C.C.*,
905 F. Supp. 2d 1088 (C.D. Cal. 2012) ........................................................7, 8, 9, 10

*Gardner v. CafePress Inc.*,
No. 3:13-CV-1108-GPC-JLB, 2014 WL 6890934 (S.D. Cal. Dec. 4, 2014) .......10

*Long v. Dorset*,
369 F. Supp. 3d 939 (N.D. Cal. 2019) ....................................................................12

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
873 F.3d 1045 (9th Cir. 2017) ....................................................................12, 13, 14

*Perfect 10, Inc. v. Giganews, Inc.*,
847 F.3d 657 (9th Cir. 2017) ........................................................................3, 4, 11, 12

*Religious Tech. Ctr. v. Netcom On-Line Comm'n Sers., Inc.*,
907 F. Supp. 1361 (N.D. Cal. 1995) ...............................................................4, 11

iii

*Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*,
    53 F.3d 1073 (9th Cir. 1995) ........................................................................................2

*Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*,
    478 F. Supp. 2d 607 (S.D.N.Y. 2007).................................................................7, 10, 11

*VHT, Inc. v. Zillow Grp., Inc.*,
    918 F.3d 723 (9th Cir. 2019) ...............................................................................*passim*

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    676 F.3d 19 (2d Cir. 2012)....................................................................11, 13, 14, 15

*Viacom Int'l, Inc. v. YouTube, Inc.*,
    940 F. Supp. 2d 110 (S.D.N.Y. 2013)...................................................................15

**Statutes**

17 U.S.C. § 512....................................................................................................*passim*

## I.    INTRODUCTION

WSI seeks to bring a claim for direct copyright infringement based only on the fact that users can submit copyrighted photographs to be automatically displayed on Amazon's website.  But to state a plausible claim for relief, WSI must allege far more:  It must allege that (1) *Amazon itself*, and not its users, copied and displayed WSI's copyrighted photographs; and (2) any copying and display that Amazon performed was not at the direction of the users who uploaded the photographs to Amazon's website.  WSI has alleged neither.

First, to state a claim for direct copyright infringement, WSI must plead that Amazon itself was the direct cause of the infringement; that is, WSI must plead that Amazon infringed through its own volitional conduct.  But courts have consistently recognized a service provider does not engage in volitional conduct—and therefore is not liable for direct copyright infringement—when its systems automatically copy or display copyrighted content submitted by users of the service.  It does not matter whether Amazon's automated system blocks *different* content uploaded by a *different* user.  Nor does it matter that the same conduct might be volitional if it were performed by a human being.  So long as an automated system is automatically copying and displaying content submitted by users in response to the user's direction, the service provider who owns that system is not directly liable for copyright infringement.

Second, even if Amazon's alleged conduct *were* volitional, WSI's claims would fail because it has alleged only that Amazon displays photographs on its website at its users' direction.  Amazon therefore enjoys the protection of Section 512(c) of the Digital Millennium Copyright Act, which insulates online services for liability for infringement that occurs "by reason of the storage at the direction of a user of" copyrighted material.  17 U.S.C. § 512(c).  Notably, the Section 512(c) safe harbor from copyright liability applies not only to the storage of copyrighted material at a user's direction, but also to any automatic processes that the service provider puts in place to provide access to that copyrighted material.  Because WSI has pointed to such automatic processes as the predicate for infringement, the complaint itself demonstrates that Amazon's conduct is fully covered by the safe harbor, and WSI's claims should be dismissed.

1

## II.    FACTUAL BACKGROUND

2

3        Amazon owns and operates the website Amazon.com, which (among other things) allows third-

party sellers to list products for sale.[1]  Second Am. and Suppl. Compl. ("SAC") (Dkt. 106) ¶ 115.[2]

4    Among the products that third-party sellers have offered via Amazon.com are Williams-Sonoma branded

5    products.  SAC ¶¶ 31, 36, 115, 120.  Although WSI may wish the rule were otherwise, courts have

6    repeatedly held that resale of genuine products is legal, whether or not it is authorized by the original

7    manufacturer.  *See, e.g.*, *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1074 (9th Cir.

8    1995).

9        The pages on Amazon.com on which products are listed are called "product detail pages."  SAC

10   ¶ 115.  The product information displayed on the relevant product detail pages, including any product

11   images, comes solely from the relevant third-party sellers.  *Id.* ¶ 116.  WSI alleges only that Amazon

12   provides "a set of guidelines and limitations" with respect to the content that third-party sellers submit

13   for inclusion on a product detail page; WSI does not allege that Amazon itself drafts the product

14   descriptions or obtains any of the product images in the first instance.  *Id.*

15       No matter how many third-party sellers offer a particular product, there will be only one product

16   detail page for that product.  *Id.*  Amazon therefore "uses multiple algorithms" to determine which

17   "seller-contributed content" ultimately appears on the product detail page when multiple sellers submit

18   different content for the same product.  *Id.* ¶ 116-117.  Amazon's algorithms operate automatically,

19   without any human review.  *Id.* ¶ 119 (alleging that Amazon uses "an algorithm instead of a human

20   being").

21       Accordingly, accepting WSI's allegations as true, if one of WSI's copyrighted images appears on

22   Amazon.com, it is because a ***third party*** decided to copy and upload that image for display on

23   Amazon.com.  Amazon's role is limited to (1) automatically displaying the photograph selected, copied,

24   and uploaded by the user; and (2) if more than one user submits a photograph, automatically blocking a

25   different photograph submitted by a different user from being displayed.  *Id.* ¶¶ 116-117.

26

27   [1] While Amazon itself also sells some products via Amazon.com, only products sold by third-party
     sellers are at issue in WSI's copyright claim.

28   [2] For the purposes of this motion only, Amazon accepts WSI's well-pleaded allegations as true.

**III.    ARGUMENT**

To survive a motion to dismiss, WSI must allege sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 570 (2007).  While the Court accepts WSI's well-pleaded factual allegations as true, it need not accept legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Here, WSI has failed to plausibly allege that Amazon is liable for direct copyright infringement because (1) it has not alleged that Amazon, as opposed to its users, engaged in volitional conduct that infringed WSI's copyrights; and (2) even if it had alleged facts constituting direct infringement, its allegations demonstrate that Amazon is protected by the DMCA safe harbor for material stored at the direction of the user.

**A.    WSI Has Not Pled Direct Infringement.**

To state a claim for direct copyright infringement, WSI must plead that Amazon itself, and not its users, is the "***direct*** cause" of any infringement of WSI's copyrights; it must plead that Amazon engaged in "volitional conduct."  *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666-67 (9th Cir. 2017) (emphasis added).  In the copyright context, the term "volition" is not an "element of intent or knowledge, [but rather] a requirement of causation."  *Id.*  While "[t]he volitional conduct requirement is not at issue in most direct-infringements cases [where] the usual point of dispute is whether the defendant's conduct is infringing . . . it comes right to the fore when a direct-infringement claim is lodged against a defendant who does nothing more than operate an automated, user-controlled system"; "[i]nternet service providers are a prime example."  *Am. Broad. Cos., Inc. v. Aereo, Inc.*, 573 U.S. 431, 454 (2014) (Scalia, J., dissenting).[3]

WSI attempts to satisfy the volitional conduct requirement by alleging that Amazon's algorithms automatically display some—but not all—photographs submitted by Amazon's users.  *See, e.g.*, SAC ¶ 117.  But the operation of an algorithm that automatically displays photographs submitted for display by third parties is not volitional conduct as a matter of law.

---

[3] As the Ninth Circuit has explained, "although the majority opinion in *Aereo* does not reference the volitional-conduct requirement, Justice Scalia's dissent offers instructive background on the doctrine." *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 732 (9th Cir. 2019).

1

2

### 1. Using an algorithm to automatically make photographs submitted by users publicly available is not volitional conduct.

3

4     The Ninth Circuit has held that a service provider does not engage in volitional conduct when it

5 "automatically cop[ies], stor[es], and transmit[s] materials upon instigation by others." *Giganews, Inc.*,

6 847 F.3d at 668 (emphasis added); *see also Zillow Grp.,* 918 F.3d at 732 (to show volitional conduct, a

7 plaintiff must provide "evidence showing [the alleged infringer] exercised control (***other than by general***

8 ***operation of its website***); selected any material for upload, download, transmission, or storage; or

9 instigated any copying, storage, or distribution of its copyrighted materials.") (alteration omitted)

10 (emphasis added); *Religious Tech. Ctr. v. Netcom On-Line Comm'n Sers., Inc*., 907 F. Supp. 1361, 1368

11 (N.D. Cal. 1995) (no volitional conduct where an online bulletin board "did not take any affirmative

12 action that directly resulted in copying plaintiffs' works other than by installing and maintaining a system

13 whereby software ***automatically*** forwards messages received from subscribers onto the Usenet, and

14 temporarily stores copies on its system") (emphasis added).

15     Automatic storage and transmission is all that WSI has alleged.  WSI alleges that (1) the

16 copyrighted photographs that appear on Amazon.com product detail pages are selected in the first

17 instance by Amazon's users and uploaded to Amazon's systems for display by those same users; and (2)

18 Amazon automatically, and without human intervention, displays some of the submitted photographs on

19 product detail pages.  *See, e.g.*, SAC ¶¶ 115-116, 119, 121-122.  Thus, Amazon's users—not Amazon—

20 are alleged to have "***selected*** [WSI's copyrighted] material for upload, download, transmission or

21 storage." *Zillow Grp.*, 918 F.3d at 732 (emphasis added).  And Amazon's users—not Amazon—are

22 alleged to have "***instigated*** any copying, storage, or distribution of [WSI's] copyrighted materials." *Id.*

23 (emphasis added).  All Amazon is alleged to have done was—"through the general operation of its

24 website," *id.*—"automatically copy, store, and transmit materials upon instigation by others," *Giganews,*

25 *Inc.*, 847 F.3d at 668.  Amazon therefore does not infringe through its own volitional conduct, as a matter

26 of law.

27

28

1
2

      **2.**      **Amazon does not directly infringe WSI's copyrights in user-submitted photographs merely because different user-submitted photographs were automatically blocked.**

3

      Although WSI recognizes that the photographs displayed on Amazon.com were copied and

4

uploaded for display by third-party sellers, WSI claims that Amazon nevertheless should be considered to

5

have "selected" the displayed photographs because Amazon's algorithms automatically (and without

6

human review) display only some of the user-submitted photographs when multiple sellers submit

7

photographs for the same product. *See, e.g.* SAC ¶¶ 117, 200.  In other words, WSI argues that because

8

Amazon automatically blocks certain photographs from appearing on its website, it should be deemed to

9

have engaged in volitional conduct with respect to different photographs, submitted by different users,

10

that were ***not*** automatically blocked.

11

      That is not the law, for at least two reasons.  First, courts have applied the well-established rule

12

that the operation of an algorithm is not volitional conduct even in situations where, as here, the service

13

provider exercises some discretion as to which user-submitted content is ultimately copied or displayed.

14

Second, courts have also held that the screening upon which WSI relies is not infringing volitional

15

conduct even when performed by a defendant's ***human employees***—let alone an algorithm.

16
17
18

      **a.**      **That Amazon, through its algorithms, has some effect on what photographs users display on product detail pages does not mean that Amazon, as opposed to its users, is the one copying and displaying WSI's images.**

19

      Courts have recognized that, so long as a third-party selects the content upon which the service

20

provider's system automatically runs and initiates the processing of that content by that system, the

21

service provider has not engaged in volitional conduct ***even if*** the service provider's technology plays

22

some role in determining which content selected by others is ultimately copied or displayed.

23

      Indeed, the Ninth Circuit recently rejected exactly the argument that WSI makes here in its

24

opinion in *Zillow Grp.*, 918 F.3d at 731.  In that case, Zillow, a real estate site, automatically displayed

25

photographs submitted by third parties.  Like Amazon, when multiple third parties submitted the same

26

image, Zillow used automatic "trumping rules" to determine which of the images would appear on

27

Zillow's website (in Zillow's case, the trumping rules were designed to prioritize the photographs in

28

which Zillow likely had the greatest display rights).  *See id.* at 733.  The plaintiff argued that Zillow therefore infringed through its own volitional conduct because "Zillow did not simply accept, post, and display **all** content including photos received from [the third parties]" but rather "designed its system including its 'trumping rules' to classify and prioritize that content and elected to display, post-sale, the copy of the photo for which it purported to have the greatest rights."  Opening Br. of Plaintiff-Appellee/Cross-Appellant, *VHT, Inc. v. Zillow Grp.*, Nos. 17-35587, 17-35588, 2017 WL 6371641, at *51-52 (9th Cir, Dec. 11, 2017) (emphasis added); *see also* Reply Br. of Plaintiff-Appellee/Cross-Appellant, *VHT, Inc. v. Zillow Grp.*, No. 17-35587, 17-35588, 2018 WL 1378430, at *30 (9th Cir. Mar. 16, 2018) (arguing that Zillow engaged in volitional conduct because it "designed and implemented a system that allows Zillow to select which copy of the same photograph it receives from multiple sources to display post-sale").  But the Ninth Circuit held that Zillow's automatic display of the photographs at issue was **not** volitional conduct, reasoning that the only control that Zillow exercised over the photographs ultimately displayed was by "general operation of its website."  *Zillow Grp.*, 918 F.3d at 732 (alteration omitted).

The same is true of Amazon, according to the allegations of the Second Amended Complaint: Amazon, like Zillow, allows users to submit photographs for display on its website.  *See* SAC ¶ 116.  Amazon, like Zillow, uses an automatic process when multiple third parties submit photographs that displays certain of the submitted photographs and not others.  *Id.* ¶¶ 116-117.  And Amazon, like Zillow, achieves this automatic display through the "general operation of its website," *Zillow Grp.*, 918 F.3d at 734, not through human review.  SAC ¶¶ 116-117.  Accordingly, Amazon, like Zillow, has not engaged in volitional conduct.

*Zillow* is not an outlier.  In a pair of cases about TV recording services, the Ninth and Second Circuits rejected the argument that the service—rather than the user—directly infringed television networks' copyrights merely because the service exercised some discretion over what content its users could choose to copy.  *See Fox Broad. Co. v. Dish Network L.L.C.*, 747 F.3d 1060 (9th Cir. 2014); *Cartoon Network LP v. CSC Holdings, Inc.* ("*Cablevision*"), 536 F.3d 121 (2d Cir. 2008).  In the Second Circuit case, the service had "unfettered discretion" over what channels would be recordable,

*Cablevision*, 536 F.3d at 126; in the Ninth Circuit case, the service not only dictated the channels that could be recorded (the four major broadcast networks), but also set the time that the recording would occur (primetime), prevented the user from halting a recording that was already in progress, and had complete control over how long recordings were saved (eight days).  *Dish Network L.L.C.*, 747 F.3d at 1064.  In both cases, however, the court found that it was the user, and not the service, that made the relevant copies because, as the Ninth Circuit explained, "operating a system used to make copies at the user's command does not mean that the system operator, rather than the user, caused copies to be made." *Id.* at 1067.

But that is all that WSI has alleged here:  that Amazon "operate[s] a system" *i.e.*, its website and algorithms, that was "used to make copies [and display photographs] at a user's command." *Id.*; *see* SAC ¶¶ 116-117.  As in *Dish* and *Cablevision*, it does not matter that Amazon (through its algorithms) can be said to have exercised some discretion as to which photographs copied and displayed at a user's command ultimately made it on to Amazon's website.

Amazon is like the services in *Dish* and *Cablevision* in another relevant respect:  It does not select, in the first instance, the copyrighted content that is eligible for inclusion within its service.  SAC ¶ 116.  Both the Second Circuit in *Cablevision* and the district court in *Dish* emphasized that while the service provider selected the **channels** eligible for recording, it did not select the copyrighted programming that would be broadcast on those channels, the network did.  *Cablevision*, 536 F.3d at 132; *Fox Broad. Co. v. Dish Network, L.C.C.*, 905 F. Supp. 2d 1088, 1101 (C.D. Cal. 2012).  Thus, in the words of the *Dish* district court, Dish could decide to "allow or disallow" a user's recording, but Dish ultimately "cannot control which programs will be broadcast."  *Dish Network, L.C.C.*, 905 Supp. 2d at 1101.

The same is true of Amazon:  Amazon's algorithms may "allow or disallow" the display of a particular photograph submitted by a user for inclusion on a product detail page, but it cannot control **which** photographs users will submit.  Amazon, like Dish, therefore does not engage in volitional conduct.

In arguing otherwise at the motion-to-amend stage, WSI pointed to the court's statement in *Zillow*

1   that Zillow did act volitionally with respect to a different part of its website (called Digs) than the one

2   discussed above when Zillow's **human** moderators selected certain photographs that had been uploaded

3   by users to be made searchable and publicly viewable.  Williams-Sonoma, Inc.'s Reply in Supp. Mot. for

4   Leave To File Second Suppl. Compl. ("Mot. to Suppl. Reply") (Dkt. 99) at 11.  But (1) Zillow's

5   moderators were human, and not automated; and (2) the decision to make certain material publicly

6   displayable and searchable on Digs was instigated by **Zillow**—not Zillow's users.  *See Zillow Grp.*, 918

7   F.3d at 737.  In any event, the court's statement was dicta, since the district court had found that Zillow

8   had engaged in volitional conduct, and Zillow had not appealed that ruling.

9           Here, it is not Amazon, but rather Amazon's **users** who instigate the display of photographs on

10  product detail pages:  WSI alleges that users select and upload photographs for that purpose.  *See, e.g.*,

11  SAC ¶¶ 6 (alleging that sellers of a product "submit proposed photographic content" for inclusion on a

12  product detail page), 116-17 (alleging that the "content submitted by the sellers goes into a large

13  database" and that "Amazon uses multiple algorithms to" determine which seller-submitted content is

14  displayed).  Amazon is therefore in the same position as Dish, not Zillow:  Regardless of the role of

15  Amazon's software in "allow[ing] or disallow[ing]" certain photographs submitted by its users, Amazon

16  (allegedly) copies and displays WSI's copyrighted photographs "only if the **user** makes the initial

17  decision to" upload the photographs for inclusion on product detail pages in the first instance.  *Dish*

18  *Network LLC*, 905 F. Supp. 2d at 1101; *see also Dish Network L.L.C.*, 747 F.3d at 1067-68 (Dish not

19  directly liable, despite Dish's significant control over what content was eligible for recording, because

20  "Dish's program creates the copy only in response to the user's command").

21                  **b.      Performing a gatekeeping function like the one WSI alleges here is not**
22                  **volitional conduct.**

23          Courts have consistently recognized that a service provider's non-volitional copying or display of

24  copyrighted material does not become volitional merely because of actions that the service provider took

25  to block the copying or display of entirely different content.

26          As noted above, in *Zillow*—much like here—Zillow's systems automatically displayed on its

27  listing platform certain third-party submitted photographs and not others if multiple copies of the same

28

1  photograph were submitted.  *See Zillow Grp.*, 918 F.3d at 734; *see also Dish Network L.C.C.*, 905 F.

2  Supp. 2d at 1101 (Dish did not act volitionally even though it had complete control over how long a copy

3  of recorded programming would be available for viewing because "it is not clear that . . . this control,

4  being exercised ***after the creation of the copies***, is relevant to whether Dish ***causes*** the copies to be made

5  in the first place.") (emphasis in original).

6      Indeed, courts have held that blocking the copy or display of different content does not render a

7  service provider's conduct volitional as to the content ultimately displayed ***even when the other content***

8  ***is blocked based on human review***.  For example, in *CoStar Grp., Inc. v. LoopNet, Inc.*, the Fourth

9  Circuit held that a real estate listing site was not directly liable when its subscribers posted infringing

10 photographs even though the photographs were (a) reviewed by one of the site's employees prior to its

11 becoming public to block photographs that were obviously copyrighted or that did not depict commercial

12 real estate and (b) made public only if the employee affirmatively clicked an "accept" button.  373 F.3d

13 544, 555–56 (4th Cir. 2004).  As the court explained, this screening process did not amount to direct

14 infringement with respect to the photographs that did ultimately appear on LoopNet's website because

15 the service provider did not "attempt to search out or select photographs for duplication; it merely

16 prevent[ed] users from duplicating certain photographs."  *Id.* at 556.

17     The same is true of Amazon—WSI does not allege that Amazon searches out or selects the

18 photographs that are ultimately displayed on product detail pages, but rather that it ***prevents*** users from

19 displaying certain, different photographs.  SAC ¶ 116-117.  Amazon's alleged actions therefore are not

20 volitional conduct.

21         **3.    Courts have repeatedly rejected claims that automated conduct is volitional**
                    **merely because similar conduct would be volitional conduct if engaged in by**
22                  **human beings.**

23     WSI tries to save its claims by alleging that "[i]f an Amazon employee were composing these

24 product detail pages from the submissions by third-party sellers, there is no doubt that Amazon would be

25 liable for direct copyright infringement when that employee copied and displayed photographs in this

26 unauthorized fashion" and that "Amazon cannot avoid liability by delegating the task to an algorithm

27 instead of a human being."  SAC ¶ 119.  But courts have repeatedly drawn exactly the distinction

28

9

AMAZON.COM, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF / CASE NO. 3:18-CV-07548-AGT

between human choices and automated processes that WSI asks this Court to ignore.

In *Cablevision*, for example, the district court had analogized Cablevision to a copy shop that makes course packs for college professors, in which the copy shop employees themselves (volitionally) copied the course materials.  The district court reasoned that, since the copy shop would be directly liable for copyright infringement when its human employees constructed the course packs, so too must Cablevision be directly liable when its automated systems provided the content that was copied.  *See Twentieth Century Fox Film Corp. v. Cablevision Sys. Corp.*, 478 F. Supp. 2d 607, 620 (S.D.N.Y. 2007).  In explaining why that analogy did not apply to Cablevision's fully automated system, the Second Circuit explained that "[i]n determining who actually 'makes' a copy, a significant difference exists between making a request to a human employee, who then volitionally operates the copying system to make the copy, and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct."  *Cablevision*, 536 F.3d at 131.  In other words, a service provider **can** "avoid liability"—at least for **direct** copyright infringement—by "delegating [a] task to an algorithm instead of a human being."  SAC ¶ 119.[4]

Other courts agree.  *See, e.g.*, *Dish Network, L.C.C.*, 905 F. Supp. 2d at 1100–02 (quoting *Cablevision* for the same proposition); *Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1309 (S.D. Fla. 2011) ("Finally, the plaintiffs contend that they have alleged a volitional act because they have alleged that hotfile.com makes additional copies once the copyrighted material is uploaded to the server.  This argument too fails, for courts have repeatedly held that the automatic conduct of software, unaided by human intervention, is not 'volitional.'"); *see also Gardner v. CafePress Inc.*, No. 3:13-CV-1108-GPC-JLB, 2014 WL 6890934, at *5 (S.D. Cal. Dec. 4, 2014) (finding that CafePress engaged in volitional conduct because "CafePress does **not** contend that its production facility and shipping process are completely automated and thus devoid of human employees engaging in volitional conduct.") (emphasis added).  That distinction makes sense, because a company's human employees exercise judgment in a way an automated system cannot.

---

[4] As discussed in Section *infra*, the outcome may different in a case about **secondary** (rather than direct) copyright liability, but WSI chose not to bring a secondary liability claim.

1    Accordingly, that the display of WSI's copyrighted photographs occurs as the result of a purely

2    automated process is fatal to WSI's copyright claim.

3           **4.     WSI's arguments would eviscerate the distinction between direct and
            secondary copyright liability.**

4

5    The fundamental flaw behind WSI's arguments is that a service provider is liable for infringing

6    conduct of its users (if at all) only under a ***secondary*** liability theory, not under the ***direct*** liability theory

7    that WSI advances here. *Cablevision*, 536 F.3d at 133-134; *Netcom*, 907 F. Supp. at 1369–70.  The

8    distinction between direct and secondary liability claims matters.  The different liability theories have

9    different requirements and different methods of proof.  But this distinction "would collapse if there were

10   not a clear rule for determining whether the ***defendant*** committed the infringing act." *Am. Broad. Cos.,*

11   573 U.S. at 455 (Scalia, J., dissenting) (emphasis added).  "The volitional-conduct requirement supplies

12   that rule; its purpose is not to excuse defendants from accountability, but to channel the claims against

13   them into the correct analytical track." *Id.*

14   WSI therefore misses the mark when it argues that enforcing the volitional conduct requirement

15   here would "upend hundreds of years of common law development that places responsibility for

16   unlawful activity, at a minimum, with those who have ***direct control*** of it." SAC ¶ 119 (emphasis

17   added).  To the contrary, it is WSI that seeks to upset the settled rule, obliterating the distinction between

18   direct and indirect infringement. As the *Cablevision* court explained, a plaintiff can "impose liability on a

19   party in a 'position to control' the infringing uses of another, ***but as a contributory [i.e., secondary], not***

20   ***direct, infringer***." *Cablevision*, 536 F.3d at 133 (emphasis added).  If WSI wanted to hold Amazon

21   liable for its users' infringement on the grounds that Amazon had "direct control" of that infringement, it

22   should have pled a secondary infringement claim.  It chose not to—likely because it could not plausibly

23   allege the required elements.  *See Giganews*, 847 F.3d at 670 ("[O]ne contributorily infringes when he

24   (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces

25   that infringement.") (quotations omitted); *id.* at 674 ("To prevail on a claim for vicarious infringement, a

26   plaintiff must prove the defendant has (1) the right and ability to supervise the infringing conduct and (2)

27   a direct financial interest in the infringing activity.") (quotations omitted). *Id.* at 673

28

---

11

1    That WSI chose not to plead secondary copyright infringement, however, does not allow it to

2    ignore the requirements for pleading direct copyright infringement—including the volitional conduct

3    requirement.  Because WSI has not pled volitional conduct, its copyright claim fails as a matter of law.

4    **B.    Amazon's Alleged Conduct Falls Within the DMCA Safe Harbor for Material
        Stored at the Direction of Users.**

5

6    Even if WSI had adequately alleged direct infringement, its claims would fail because its

7    allegations demonstrate that Amazon falls within the protection of the DMCA safe harbor for content

8    stored at the direction of the user.  The applicability of the DMCA safe harbor is an independent basis for

9    dismissal of WSI's copyright claim.  *See Long v. Dorset*, 369 F. Supp. 3d 939, 947 (N.D. Cal. 2019)

10   (dismissing plaintiff's claims because the DMCA safe harbors applied).

11   Section 512 of the DMCA is intended to "strike[] a balance between the interests of copyright

12   holders in benefiting from their labor; entrepreneurs in having the latitude to invent new technologies

13   without fear of being held liable if their innovations are used by others in unintended infringing ways;

14   and those of the public in having access to both."  *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873

15   F.3d 1045, 1051 (9th Cir. 2017) (internal quotations and alterations omitted).  It strikes this balance by

16   "requiring service providers to take down infringing materials when copyright holders notify them of the

17   infringement and by limiting service providers' liability for unintentional infringement through several

18   safe harbors."  *Id.* at 1051-52.  If one of the safe harbors applies, the service provider is insulated from

19   liability for damages and most types of injunctive relief.  The relevant safe harbor here is the one

20   provided under Section 512(c) of the DMCA, which dictates that a service provider (like Amazon) "shall

21   not be liable for . . . infringement of copyright ***by reason of the storage at the direction of a user*** of

22   material that resides on a system or network controlled or operated by or for the service provider," so

23   long as certain conditions not at issue here are met.  17 U.S.C. § 512(c) (emphasis added).

24   The Section 512(c) safe harbor is not limited to the actual storage of the relevant infringing

25   material, but extends to automatic processes that a service provider uses to enhance other users' access to

26   that material.  *See, e.g.*, *Mavrix Photographs,* 873 F.3d at 1056, 1056 n.2 (safe harbor applies "if the

27   service provider carried out activities that were 'narrowly directed' towards enhancing the accessibility

28

of the posts," including "software processes that automatically occur when a user uploads materials" to the service provider's website); *see also Viacom Int'l, Inc. v. YouTube, Inc*., 676 F.3d 19, 39 (2d Cir. 2012) ("*YouTube I"*) ("The relevant case law makes clear that the § 512(c) safe harbor extends to software functions performed for the purpose of facilitating access to user-stored material.") (quotation omitted).  WSI has alleged exactly that:  WSI alleges only that Amazon's software automatically provides public access to certain copyrighted photographs submitted by third-party sellers for that purposes.  SAC ¶¶ 116-117.

WSI argues that the display of its copyrighted photographs on product detail pages does not qualify as "storage at the direction of a user"—and that Section 512(c) therefore does not apply—because Amazon's software also automatically blocks certain other photographs, submitted by different users, from appearing on Amazon's website.  *See, e.g.*, SAC ¶ 6 ("when multiple images exist for a product, Amazon, by and through its algorithms, selects which product image, among other elements, is most likely to make the sale and displays that image on the public listing page for the product"); *id.* ¶ 7 ("Amazon's algorithms have repeatedly selected WSI's copyrighted images to copy and display on Amazon's product listings.").  WSI claims that such blocking, if performed by a human agent, would not be at the direction of the user, and, thus, the blocking also cannot be at the direction of the user if performed automatically.  SAC ¶ 119.

The case law says otherwise—including the main case on which WSI relies, *Mavrix Photographs, LLC v. Livejournal, Inc*.  The question in *Mavrix* was whether the district court had properly granted LiveJournal summary judgment despite the fact that LiveJournal used human moderators to screen and publicly post content.  In reversing, the Ninth Circuit held that the factfinder would have to consider two questions:  (1) whether the human moderators were LiveJournal's agents; and (2) if so, whether the infringing photographs were stored at the direction of the user, in light of the human moderators' role.  *Mavrix Photographs, LLC*, 873 F.3d at 1057.

The Ninth Circuit's guidance as to the second question—whether content was stored at the direction of the user if screened by human moderators—precludes WSI's claim here as a matter of law.  The Ninth Circuit noted that "automatic processes," including "software processes that automatically

occur when a user uploads materials," had previously been "approved as accessibility-enhancing such

that any infringements were still by reason of storage at the direction of the user."  *Mavrix*, 873 F.3d at

1056 n.12 (emphasis added) (quotation marks omitted).  The question, then, was "whether the

moderators' acts were merely accessibility-enhancing activities or whether instead their extensive,

manual, and substantive activities went beyond the automatic and limited manual activities we have

approved as accessibility-enhancing."  *Id.* at 1056.  In other words, under the Ninth Circuit's ruling in

*Mavrix*, "***extensive***, ***manual***, and substantive activities" can, under certain circumstances, fall outside the

safe harbor.  *Id.* (emphasis added).  But "***automatic*** and ***limited manual*** activities are fully covered."  *Id.*

(emphasis added); *see also BWP Media USA, Inc. v. Clarity Digital Grp., LLC*, 820 F.3d 1175, 1181

(10th Cir. 2016) ("[I]f the infringing content has merely gone through a screening ***or*** automated process,

the ISP will generally benefit from the safe harbor's protection.") (emphasis added).

WSI attempts to limit *Mavrix*'s clear holding that automatic process fall within the safe harbor to

processes that "reformat[] posts or perform[] some technological change."  Mot. to Suppl. Reply at 10.

While *Mavrix* gave those actions as ***examples*** of accessibility-enhancing, however, its holding is not so

constrained.  In defining what constitutes "accessibility-enhancing activities," the Ninth Circuit relied

explicitly on the Second Circuit's and District Court's opinions in *Viacom Int'l Inc. v. YouTube*, both of

which approved as "accessibility-enhancing" activities that went far beyond the mere reformatting of

user posts.

Specifically, in *Viacom Int'l, Inc. v. YouTube, Inc.*, the Second Circuit held that YouTube's

"related videos" function was covered by the safe harbor for storage of copyrighted material at the

direction of the user.  The "related videos" function is a feature "by which ***a YouTube computer***

***algorithm identifies and displays*** 'thumbnails' of clips that are 'related' to the video selected by the

user."  *YouTube I,* 676 F.3d at 39-40 (emphasis added).  The Second Circuit reasoned that the "related

videos function" was covered by the DMCA safe harbor because it was (a) "fully automated and operates

solely in response to user input without the active involvement of YouTube employees" and (b) "serve[d]

to help YouTube users locate and gain access to material stored at the direction of other users."  *Id.* at 40.

It also held, however, that a different service that YouTube offered whereby YouTube ***manually***

selected certain videos to be "syndicated" to other companies may not have been covered by the DMCA, and remanded for further fact-finding. *Viacom*, 676 F.3d at 40.  On remand, the district court found that none of the works in suit were actually subject to manual review and that the safe harbor therefore applied.  *Viacom Int'l, Inc. v. YouTube, Inc* ("*YouTube II*"), 940 F. Supp. 2d 110, 122-23 (S.D.N.Y. 2013).  It did not matter, the district court reasoned, that YouTube entered into the syndication arrangements at issue "for its own business purposes, and not at the direction of users."  *Id.*  What mattered was that YouTube's actions constituted "steps by a service provider taken to make user-stored videos more readily accessible (***without manual intervention***) from its system to those using contemporary hardware."  *Id.* (emphasis added).

WSI distinguishes *YouTube* because "the defendant [in *YouTube*] recommended preexisting user-uploaded content," rather than "decid[ing] **which** content would be uploaded."  Mot. to Suppl. Reply at 10.  That is a distinction without a difference:  In both *YouTube* and here, the ***user*** decided to upload copyrighted content for display on the service provider's website, and that content was, in fact, displayed based on the operation of "fully automated" processes that "operate[] solely in response to user input without the active involvement of [the service provider's] employees."  *YouTube I*, 676 F.3d at 40; *see also, e.g.*, *Distribuidora De Discos Karen C. Por A. v. Guerra Seijas*, No. 13CIV. 5200 NRB, 2015 WL 4496066, at *8 (S.D.N.Y. Mar. 26, 2015) (denying motion to dismiss on grounds that iTunes fell within the safe harbor because it was "possible that Apple routinely takes some initiative in deciding which songs appear on iTunes and how those songs appear," while noting that even functions like preventing Apple users from purchasing certain songs a la carte "would not negate the 'storage at the direction of users' element if Apple performs these functions in a systematic, ***automated*** way," but rather would remove safe harbor protection only if "Apple routinely performs material, discretionary, ***manual*** functions on incoming songs") (emphasis added).

Because WSI alleges only that Amazon's "algorithms" automatically make certain copyrighted photographs accessible publicly, its copyright claim falls within the DMCA safe harbor and should be dismissed.

1  **IV.    CONCLUSION**

2          For the foregoing reasons, Amazon respectfully requests that the Court dismiss WSI's copyright

3  claim, without leave to amend.

4   Dated:  May 20, 2020                    DURIE TANGRI LLP

5

6                                                       By: _____

7                                                              DARALYN J. DURIE
                                                              MARK A. LEMLEY
8                                                              JOSEPH C. GRATZ
                                                              ALLYSON R. BENNETT
9                                                              MATTHAEUS MARTINO-WEINHARDT
                                                              PETER S. HORN

10                                                      Attorneys for Defendant
                                                        AMAZON.COM, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2

I hereby certify that on May 20, 2020 the within document was filed with the Clerk of the Court

3

using CM/ECF which will send notification of such filing to the attorneys of record in this case.

4

5

DARALYN J. DURIE
6
MARK A. LEMLEY
JOSEPH C. GRATZ
7
ALLYSON R. BENNETT
MATTHAEUS MARTINO-WEINHARDT
8
PETER S. HORN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMAZON.COM, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT THEREOF / CASE NO. 3:18-CV-07548-AGT