DURIE TANGRI LLP
DARALYN J. DURIE (SBN 169825)
ddurie@durietangri.com
MARK A. LEMLEY (SBN 155830)
mlemley@durietangri.com
JOSEPH C. GRATZ (SBN 240676)
jgratz@durietangri.com
MATTHAEUS MARTINO-WEINHARDT (SBN 313103)
mweinhardt@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:    415-362-6666
Facsimile:    415-236-6300

DURIE TANGRI LLP
ALLYSON R. BENNETT (SBN 302090)
abennett@durietangri.com
PETER S. HORN (SBN 321358)
phorn@durietangri.com
953 East 3rd Street
Los Angeles, CA 90013
Telephone:    213-992-4499
Facsimile:    415-236-6300

Attorneys for Defendant
AMAZON.COM, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WILLIAMS-SONOMA, INC., | Case No. 3:18-cv-07548-AGT |
| Plaintiff, | **AMAZON.COM, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED AND SUPPLEMENTAL COMPLAINT** |
| v. | |
| AMAZON.COM, INC., | Date:     June 26, 2020 |
| Defendant. | Time:     10:00 a.m. |
| | Ctrm:     A – 15th Floor |
| | Judge:    Honorable Alex G. Tse |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................................1

II.    ARGUMENT .............................................................................................................2

       A.     WSI Has Not Pled That Amazon Engages In Volitional Conduct ....................2

              1.     Amazon's customers, not Amazon, engage in the volitional conduct giving
                     rise to infringement. ..........................................................................2

              2.     Nonvolitional conduct does not become volitional because only some user-
                     submitted photographs are automatically displayed. ...................................4

              3.     WSI's straw-man arguments are unavailing. ............................................7

       B.     WSI's Claim Should Also Be Dismissed Under Section 512(c) of the DMCA ................12

              1.     WSI has pled only storage at the direction of the user. ..........................12

              2.     WSI is estopped from arguing that something other than Amazon's
                     algorithmic, photograph-uploading process removes it from the DMCA
                     safe harbor. ....................................................................................13

              3.     WSI has not plausibly alleged that the operation of Amazon's software
                     gives it the "right and ability to control" users' infringement. .............14

III.   CONCLUSION ........................................................................................................15

i

AMAZON.COM, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED AND
SUPPLEMENTAL COMPLAINT / CASE NO. 3:18-CV-07548-AGT

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Am. Broad. Cos. v. Aereo, Inc.*,
573 U.S. 431 (2014)............................................................................................4, 5, 7, 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................................................4

*Capital Records, LLC v. Vimeo, LLC*,
972 F. Supp. 2d 500, 528, 529 (S.D.N.Y. 2013)..........................................................15

*Cartoon Network LP, LLP v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008).........................................................................................3

*CoStar Grp., Inc. v. LoopNet, Inc.*,
373 F.3d 544 (4th Cir. 2004) .....................................................................................4, 5

*Disney Enters., Inc. v. Hotfile Corp.*,
798 F. Supp. 2d 1303 (S.D. Fla. 2011) ....................................................................4, 10

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157, 1170 (9th Cir. 2008) ........................................................................6, 7

*Fox Broad. Co. v. DISH Network L.L.C.*,
747 F.3d 1060 (9th Cir. 2014) ...................................................................................3, 5

*Interstate Fire & Cas. Co., an Illinois Corp. v. Underwriters at Lloyd's, London*,
139 F.3d 1234 (9th Cir. 1998), *as amended* (May 13, 1998) ..........................................14

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
873 F.3d 1045 (9th Cir. 2017) ...........................................................................12, 13, 14

*Milo & Gabby, LLC v. Amazon.com, Inc.*,
No. C13-1932RSM, 2015 WL 4394673 (W.D. Wash. July 16, 2015)............................15

*New York Times Co. v. Tasini*,
533 U.S. 483 (2001)....................................................................................................9, 10

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
213 F. Supp. 2d 1146 (C.D. Cal. 2002) .......................................................................15

*Perfect 10, Inc. v. Giganews, Inc.*,
847 F.3d 657 (9th Cir. 2017) ..................................................................................*passim*

*Perfect 10 v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ......................................................................................10

ii

AMAZON.COM, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED AND
SUPPLEMENTAL COMPLAINT / CASE NO. 3:18-CV-07548-AGT

*Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*,
  907 F. Supp. 1361 (N.D. Cal. 1995) .........................................................................................3

*UMG Recordings, Inc. v. Shelter Capital Partners, LLC*,
  718 F.3d 1006 (9th Cir. 2013) ........................................................................................12, 14

*Verse Two Props., LLC v. MedPlast Fremont, Inc.*,
  No. 5:14-CV-03765-EJD, 2015 WL 6955133 (N.D. Cal. Nov. 10, 2015).........................12

*VHT, Inc. v. Zillow Grp., Inc.*,
  918 F.3d 723 (9th Cir. 2019) ......................................................................................*passim*

*Viacom Int'l, Inc. v. YouTube, Inc.*,
  676 F.3d 19 (2d Cir. 2012)..............................................................................................12

**Statutes**

17 U.S.C. § 512.................................................................................................6, 9, 12, 14

47 U.S.C. § 230 ...................................................................................................1, 6, 7

**Other Authorities**

Restatement (Third) of Agency § 1.01 (2006) .............................................................3

1    **I.     INTRODUCTION**

2        Reading WSI's opposition brief, it is easy to forget that this motion presents a question of

3    copyright law.  WSI relies on a case about Section 230 of the Communications Decency Act, a statute

4    that states on its face that it has "no effect on intellectual property law."  It talks at length about an

5    Amazon patent not mentioned in the complaint.  And WSI presents colorful hypotheticals—dystopian

6    mass murder robots! airplane crashes! AI run amok!—that have no connection to the narrow copyright

7    question raised by Amazon's motion.  WSI cannot transform this ordinary internet-intermediary-liability

8    case into something more exciting, because its theory of direct copyright infringement is squarely

9    foreclosed by Ninth Circuit precedent.  The Court can safely set aside the killer-robot questions, to be

10   taken up in a case that actually presents them.

11       Instead of killer robots, WSI's copyright claim is about one picture of peppermint bark uploaded

12   to Amazon.com by one of Amazon's users.  WSI alleges that:

13       - Amazon's users (not Amazon) copy and upload every photograph that appears in
14         connection with the products that users list on Amazon.com, SAC ¶¶ 6, 116;

15       - Amazon's users (not Amazon) upload the photographs with the intent that they appear on
16         product detail pages on Amazon.com, *id.* ¶ 6; and

17       - When multiple sellers submit images for a particular product, Amazon's software
18         automatically[1] (with no human intervention) copies and displays on its website some of
19         the user-submitted images, *id.* ¶¶ 116-117, 121.

20   WSI appears to concede that Amazon would not be liable if it "indiscriminate[ly]" copied and displayed

21   every user-submitted photograph.  WSI nevertheless argues that Amazon directly infringes its copyrights

22   because only a subset of user-uploaded photographs wind up on Amazon.com.  Under WSI's theory, if

23   five users each upload a copyrighted photograph to Amazon's system, and Amazon.com shows all five,

24   Amazon is not liable for infringement of the copyrights in any of the five images.  If, however, Amazon's

25

26   ───────────────────────────
     [1] WSI takes issue with Amazon's use of the word "automatic," claiming that an "automatic" process is
27   different from a "non-human" or "automated" process (which is what WSI alleges Amazon uses).  Opp'n
     at 4.  No one told Black's Law Dictionary.  *See* Black's Law Dictionary (11th ed. 2019) (defining
     "automatic" with respect to a "device or process" as "working with little or no direct human control");
28   *see also* Merriam-Webster Dictionary, *available at* https://www.merriam-
     webster.com/dictionary/automated (defining "automated" as "operated automatically").

1   system shows the first one, and then more users upload more images and Amazon does not show the

2   additional photographs, Amazon becomes directly liable for infringement as to the first image.  That

3   makes no sense.  Fortunately, it is not the law.

4        WSI's hand-wringing changes neither the allegations of its complaint, nor the case law holding

5   that an online service is not liable for direct copyright infringement (and is entitled to the benefits of the

6   DMCA safe harbor) when it automatically copies and displays user-selected photographs.  Such claims

7   sound, if at all, in secondary, not direct, copyright liability.  WSI chose (for good reasons) not to bring

8   secondary liability claims.  Amazon's motion to dismiss should be granted, without leave to amend.

9   **II.**    **ARGUMENT**

10        **A.**    **WSI Has Not Pled That Amazon Engages In Volitional Conduct**

11            **1.**    **Amazon's customers, not Amazon, engage in the volitional conduct giving rise**
12                     **to infringement.**

13        WSI acknowledges that Amazon can be liable for direct copyright infringement only if it is the

14   actor whose "volitional conduct" causes the specific instances of infringement.  WSI also acknowledges

15   that the volitional conduct requirement "stands for the unremarkable proposition that proximate causation

16   historically underlies copyright infringement liability."  *Perfect 10, Inc. v. Giganews, Inc*., 847 F.3d 657,

17   666 (9th Cir. 2017) (quoted in Opp'n at 8).  But WSI tries to expand the definition of volitional conduct

18   to encompass conduct that is merely "*a* 'cause'" or a "*but-for* cause" of infringement.  Opp'n at 7, 14

19   (emphasis added).  That standard would read the volitional conduct requirement out of copyright law.

20        Any time a user uploads infringing content to or using an online service, the online service is a

21   "but for" cause of the infringement.  Take a pirated copy of *Frozen* uploaded to YouTube.  The uploader

22   (*i.e*, the person who pirated the movie), would first have copied the movie with a computer, perhaps built

23   by Dell, and transmitted it using her home internet connection, perhaps provided by AT&T.  The movie

24   would then have passed through servers, maybe owned by Google, before ultimately appearing on

25   YouTube.  Under WSI's "*a* cause" test, Dell, AT&T, Google and YouTube would ***all*** be directly liable

26   for copyright infringement because they are all a "but for" cause of the pirated movie appearing on

27   YouTube.  So, for that matter, would the power company, without which the computer couldn't have

28   been turned on.  Preventing that absurd result is why the volitional conduct requirement exists:  "Where

2

AMAZON.COM, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED AND
SUPPLEMENTAL COMPLAINT / CASE NO. 3:18-CV-07548-AGT

1   the infringing subscriber is clearly directly liable for the same act, it does not make sense to adopt a rule

2   that could lead to the liability of countless parties whose role in the infringement is nothing more than

3   setting up and operating a system that is necessary for the functioning of the Internet." *Religious Tech.*

4   *Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1372 (N.D. Cal. 1995).

5         The question, then, is not whether WSI has alleged that Amazon's system is *a* cause of the

6   infringement.  The question is whether WSI has alleged that Amazon did something ***more*** than

7   "operating a system used to make copies [and display photographs] at the user's command."  *Fox Broad.*

8   *Co. v. DISH Network L.L.C.*, 747 F.3d 1060, 1067 (9th Cir. 2014); *see also Giganews*, 847 F.3d at 670

9   ("automatic copying, storage, and transmission of copyrighted materials, when instigated by others, does

10  not render an [Internet service provider] strictly liable for copyright infringement[.]") (alteration in

11  original).  WSI hasn't alleged that, and so its copyright claim fails.

12        In arguing otherwise, WSI claims the court should treat things done algorithmically by computers

13  as though they were the product of individualized acts of human judgment.  Why?  Because, on WSI's

14  view, "the common law of agency applies under the Copyright Act," and Amazon's algorithms are

15  "software agents."  Opp'n at 16-17.  But WSI cites no case classifying a computer program as a common

16  law agent.  An agency relationship is created when "one ***person*** (a 'principal') manifests assent to

17  another ***person*** (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's

18  control, and the agent ***manifests assent*** or otherwise ***consents*** so to act."  Restatement (Third) of Agency

19  § 1.01 (2006) (emphasis added).  The only person who is alleged to have done anything with WSI's

20  photos is the user who uploaded them in the first place.  Computer programs are not "persons" and

21  cannot be agents any more than a copy machine is the agent of the company that makes it.  Just as Xerox

22  is not liable when a customer uses its machines to copy a copyrighted image, neither is Amazon.

23        Even accepting WSI's assertion that a computer program—which cannot "consent" to anything—

24  is a common law "software agent," courts have repeatedly held that fully automated processes that copy

25  or display user-submitted content are not volitional conduct, even if similar actions would be volitional

26  conduct if performed by humans.  *See, e.g.*, *Cartoon Network LP, LLP v. CSC Holdings, Inc.*

27  ("*Cablevision*"), 536 F.3d 121, 131 (2d Cir. 2008) ("In determining who actually 'makes' a copy, a

28  significant difference exists between making a request to a human employee who then volitionally

operates the copying system to make the copy, and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct."); *Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1309 (S.D. Fla. 2011) ("courts have repeatedly held that the automatic conduct of software, unaided by human intervention, is not 'volitional.'").  WSI may think that rule is "foolish from a policy perspective," Opp'n at 19, but even if it were (and it isn't), it would still be the law.

### 2. Nonvolitional conduct does not become volitional because only some user-submitted photographs are automatically displayed.

WSI concedes that an online service is not directly liable for copyright infringement when it "supplies the same set of technical enhancement services for every single piece of content uploaded by a user."  Opp'n at 9.  But that is what WSI alleges here:  WSI alleges that all user-submitted photographs are processed by a set of Amazon algorithms, resulting in some photographs being posted on Amazon's website.  *See* SAC ¶ 117.

WSI cannot get around this problem by calling Amazon's automatic processes "editorial selection."  *See* Opp'n at 5, 11, 16; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (plaintiff must plead more than "labels and conclusions").  The "editorial selection" that WSI complains about is the fact that Amazon's systems automatically block certain user-submitted photographs from display on its website.  In arguing otherwise, WSI makes much of the fact that its complaint never uses the word "block."  *Id.* at 15.  WSI itself, however, asserts that "[m]any user images will never be displayed."  *Id*.  Whatever phrasing WSI prefers, the fact that some images submitted by different users are not displayed does not establish that Amazon has engaged in volitional conduct with respect to those images that are displayed.  *See, e.g.*, *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731-732 (9th Cir. 2019) (Zillow not liable for direct copyright infringement when it used automated "trumping rules" that displayed some, but not all, photographs submitted by third parties); *CoStar Grp., Inc. v. LoopNet, Inc*., 373 F.3d 544, 555–56 (4th Cir. 2004) (LoopNet not directly liable, even though its employees "accepted" only pictures of real estate for publication on its website because LoopNet did not "attempt to search out or select photographs for duplication; it merely prevent[ed] users from duplicating certain photographs").

Nor can WSI salvage its position by selectively quoting from Justice Scalia's dissent in *Aereo*.

Mot at 9. In his dissent, Justice Scalia observed that courts had previously found no volitional conduct on the part of an online service that automatically facilitated the transfer of data between users and was "totally indifferent to the material's content." *Am. Broad. Cos. v. Aereo, Inc.*, 573 U.S. 431, 454 (2014) (Scalia, J., dissenting). But Justice Scalia did not purport to pronounce that this fact pattern would be the only way to avoid a finding of volitional conduct. Rather, Justice Scalia explained that "courts require 'some aspect of volition' directed at the copyrighted material before direct liability may be imposed," noting that "[m]ost of the time that issue will come down to who selects the copyrighted content: the defendant or its customers." *Id.* Where users copy and upload copyrighted photographs to an online system for the express purpose that they be displayed online, the ***users*** select the copyrighted content, not the online service. That does not change just because some of the photographs that users select are ultimately not shown, whether because they are duplicative or fail quality standards or for some other reason other than as a result of individual human action.

If copying and displaying some, but not all, third-party provided content were the type of "selection" that amounts to volitional conduct, many of the seminal volitional conduct cases would have come out the other way:

- Zillow "selected" the pictures of houses appearing on its website because its trumping rules automatically displayed certain copies but not others, when multiple copies of the same photograph were uploaded by third-parties, *Zillow*, 918 F.3d at 733;

- LoopNet "selected" the photographs displayed on its website when its employees chose to "accept" the user-submitted photographs depicting commercial real estate, but not photographs depicting other subject matters, *LoopNet*, 373 F.3d at 556; and

- DISH "selected" the television programs that its users recorded using its PrimeTime Anytime Feature when DISH configured that feature to automatically record all content displayed during prime time on certain television channels, but not content displayed at different times on different channels, *Fox Broad. Co. v. DISH Network L.L.C.*, 747 F.3d 1060, 1064 (9th Cir. 2014).[2]

---

[2] WSI dismisses the district court's opinion in *DISH* on the grounds that the copyrighted content displayed on the channels was chosen by the copyright owners, not infringers. Opp'n at 15. But that doesn't matter: Whether the content was chosen by the copyright owner or the user, it still isn't DISH doing the choosing.

1   Yet Zillow, LoopNet, and DISH were not directly liable, and neither is Amazon.

2       Indeed, WSI provides no definition—whether from the case law or otherwise—of the type of

3   "editorial selection" that leads to direct copyright liability when copyrighted content is chosen and

4   uploaded for public display by users.  Opp'n at 15.  WSI throws around the concept of "indiscriminate"

5   display or distribution, but we know that truly "indiscriminate" publication or display of all user-

6   submitted content is ***not*** required, or Zillow and LoopNet would both have been liable.  WSI next claims

7   that implementing "a content filter" would not lead to direct liability, *id.*, but what is the difference

8   between non-volitional "content filtering" and volitional "editorial selection" of third-party submitted

9   content?  Is using software to automatically display user-submitted photographs of a certain resolution,

10  but not others, non-volitional "content filtering" or volitional "editorial selection?"  How about using

11  software to automatically display only the ten photographs of the highest resolution, no matter their

12  subject matter?  How about using software to automatically display the ten photographs of the highest

13  resolution that also depict houses?

14      Luckily, courts are not saddled with this endless line-drawing, because ***none*** of these actions are

15  volitional conduct:  An online service does not engage in volitional conduct when it "automatically

16  cop[ies], stor[es], and transmit[s] materials upon instigation by others."  *Giganews, Inc.*, 847 F.3d at 668.

17  When the user finds the copyrighted photograph, copies the copyrighted photograph, and uploads the

18  copyrighted photograph to Amazon's website with the intention that the photograph end up online, the

19  user is the one who "selected" the photograph for "upload, download, transmission, or storage." *Zillow*

20  *Grp.,* 918 F.3d at 738.  Amazon is not.  That is true even if Amazon, through the "general operation of its

21  website," *id.*, has automated systems in place that mean that "[m]any user images will never be

22  displayed," Opp'n at 15.

23      *Roommates.com*, a case that WSI discusses at length, cannot help WSI avoid the controlling

24  Ninth Circuit cases.  *See id.* at 10.  First things first:  *Roommates.com* had nothing to do with copyright

25  law.  *Roommates.com* involved Section 230 of the Communications Decency Act.  By its own terms,

26  Section 230 has "no effect on intellectual property law" and shall not be "construed to limit or expand

27  any law pertaining to intellectual property."  47 U.S.C. § 230(e)(2).  And its safe harbor is completely

28  different than the safe harbors in the DMCA.  *Compare* 17 U.S.C. § 512.

1    But to the extent that *Roommates.com* has any relevance here, it supports Amazon.  The Ninth

2    Circuit held in *Roommates.com* that when a user "tender[s] material to [a service] for posting online,"

3    and the service then "determine[s] whether or not to prevent its posting," that is "precisely the kind of

4    activity for which section 230 was meant to provide immunity."  *Fair Housing Council of San Fernando*

5    *Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170 (9th Cir. 2008).  In other words "any activity that

6    can be boiled down to deciding whether to exclude material that third parties seek to post online is

7    perforce immune."  *Id.* at 1170-71.  Here, WSI alleges only that Amazon has displayed (through its

8    software) copyrighted photographs tendered to it for posting online by it users, and excluded (also

9    through its software) different photographs submitted by different users.  SAC ¶¶ 6, 116-117.  That is the

10   same conduct that the Ninth Circuit held would ***not*** trigger liability in *Roommates.com*.

**3.   WSI's straw-man arguments are unavailing.**

11

12   Because WSI cannot escape the case law holding that Amazon has not engaged in volitional

13   conduct, WSI instead rebuts a series of arguments that Amazon never made.

14   ***First***, WSI argues that "[t]here is no requirement that only one party be held liable for

15   infringement.  Rather, all who are responsible can be held liable."  Opp'n at 8 (emphasis omitted).  True,

16   but irrelevant.  Amazon does not dispute that multiple infringers can act in concert to infringe the same

17   copyright.  That does not answer the question of ***who*** is an infringer (the online service, the user, or

18   both).  Here, the answer to the question of ***who*** is the infringer is easy:  The infringer is the user who

19   uploaded WSI's copyrighted photograph of peppermint bark.  This isn't a case where applying

20   controlling law on volition would leave WSI without a direct infringer to sue.  To the contrary, the

21   obvious volitional actor is the person who uploaded the photograph to Amazon.  She is the direct

22   infringer on WSI's theory.  WSI might not want to sue her, but that doesn't justify its effort to overturn

23   decades of precedent to redefine Amazon's software as a volitional actor.

24   That multiple entities can infringe also does not answer the question of ***what*** theory of liability

25   applies (direct or secondary).  The volitional conduct requirement draws the line between those who are

26   direct infringers and those who are at most secondarily liable.  *Am. Broad. Cos.*, 573 U.S. at 455 (Scalia,

27   J., dissenting) (purpose of the volitional conduct requirement "is not to excuse defendants from

28   accountability, but to channel the claims against them into the correct analytical track").

7

1   The volitional conduct requirement provides that an online service like Amazon is not ***directly***

2   liable for copyright infringement when it automatically copies and displays photographs submitted by

3   users.  But that does not cut off all potential liability:  The service could still be liable for ***secondary***

4   copyright infringement in appropriate circumstances—a point discussed at length in Amazon's opening

5   brief and which WSI ignores entirely.  Direct liability holds a defendant liable for her own infringement,

6   while secondary liability holds her liable for someone else's infringement.[3]

7   Copyright owners would rather bring direct liability claims because direct infringers face strict

8   liability:  As WSI notes repeatedly, if you are a direct infringer, intent does not matter and neither does

9   knowledge.  *See, e.g.*, Opp'n at 17.  Secondary liability reaches a much broader range of actors, but for

10  that reason it is harder to prove:  Generally, the plaintiff must show that the defendant (a) intentionally

11  induced the infringement, (b) materially contributed to the infringement with sufficient knowledge, or (c)

12  had the right and ability to supervise the infringing conduct and a direct financial interest in the

13  infringing activity.  *See, e.g.*, *Giganews*, 847 F.3d at 670, 674.  But Amazon had no such knowledge or

14  control.  WSI cannot plead secondary liability here because when WSI found a copyrighted picture of

15  peppermint bark on Amazon's website, it ran straight to court instead of telling Amazon about it and

16  asking that it be removed.

17  The distinction between direct and secondary liability has critically important implications.  The

18  internet is built on algorithms, which daily process terabytes of data uploaded and transmitted by millions

19  of users worldwide.  WSI would hold providers of internet infrastructure ***strictly liable*** for infringement

20  of any copyrighted material that passes through it, so long as a company's software can be characterized

21  as engaging in any "editorial selection," *i.e.*, if the service does anything other than "automatic[ally] and

22  ***indiscriminate[ly]*** distribut[e]" all content that a customer chooses to upload.  Opp'n at 5, 13 (emphasis

23  added).  As WSI proudly proclaims, if any so-called "editorial selection" occurs (and recall that WSI is

24  notably vague about what might meet that test), strict liability would attach even if "no specific human"

---

[3] WSI posits that Amazon must be directly liable because otherwise no one would be liable when Seller 1 uploads an infringing photograph, and that photograph "accompan[ies] the sales" of four other sellers who did not upload it.  Opp'n at 12.  But it is the copying and display of the photograph—and not the sales—that lead to copyright liability.  Accordingly, Seller 1 would still be liable for copyright infringement, even if it never had *any* sales.

AMAZON.COM, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED AND
SUPPLEMENTAL COMPLAINT / CASE NO. 3:18-CV-07548-AGT

employee of the company was *ever* "aware" of the infringing material, let alone knew that it was copyrighted.  *Id.* at 16, 18.  WSI thus proposes that employing filters to automatically block some content that is duplicative or of poor quality or potentially graphic or contains a computer virus would create strict liability for the copyright status of the content that remains.

Avoiding this absurd result is one reason enforcing the volitional conduct requirement matters: not to absolve online services from liability, but to ensure that services are held liable (secondarily) for their users' illegal actions only when the service sufficiently contributed to or controlled the infringement.[4]

*__Second__*, WSI argues that Amazon "proposes that the Court adopt a general rule that [corporations using] software . . . cannot be held liable for copyright infringement, period."  Opp'n at 16. Not so.  If Amazon used software to copy WSI's copyrighted images from WSI's website and post them on Amazon's website, the fact that software was involved would not, in and of itself, insulate Amazon from direct copyright liability.  Rather, the fact that Amazon's system is fully automated matters here because Amazon's *users*, and not Amazon itself, allegedly copied WSI's photographs and uploaded them to Amazon's system in the first instance, with the express intent that the photographs be displayed on Amazon.com.  SAC ¶¶ 6, 116-117.  As noted above, the law is clear that when copyrighted content is selected and uploaded for public display by *users*, an online service provider's automatic copying and display of that content is not the volitional conduct giving rise to copyright infringement.  That is true even if different content submitted by different users is automatically kept offline.

The cases that WSI cites in its brief support this distinction.  The cases involving automated (as opposed to human) processes on which WSI relies generally were ones in which the copyrighted content was chosen in the first instance by the *service*, not by the user.

For example, in *New York Times Co. v. Tasini*, 533 U.S. 483, 489 (2001), the defendant *publisher*

---

[4]   Secondary liability on the Internet is also subject to a complex statutory notice-and-takedown scheme. 17 U.S.C. § 512. WSI could have used that scheme to get the peppermint bark photo taken down, but it chose not to.  Instead, it asks this Court to declare that detailed statutory compromise irrelevant, allowing any plaintiff to bypass it by intoning the words "editorial selection."

9

AMAZON.COM, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED AND SUPPLEMENTAL COMPLAINT / CASE NO. 3:18-CV-07548-AGT

"code[d] each article to facilitate computerized retrieval, then transmit[ted] it in a separate file."[5]

Similarly, in *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 n.6 (9th Cir. 2007), the defendant **Google** "initiated and controlled" the storage and communication of the copyrighted thumbnail images at issue.  Indeed, the Ninth Circuit has made clear that that case expressly did not address "passively storing material at the direction of users in order to make that material available to other users upon request," or "automatically copying, storing, and transmitting materials upon instigation by others." *Giganews*, 847 F.3d at 668.

WSI also points to *Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303 (S.D. Fla. 2011), for the proposition that a "volitional act" can include "'using software to search for material to upload.'" Opp'n at 18-19 (quoting *Hotfile* at 1308).  But the *Hotfile* court's full analysis, which WSI truncates, makes clear that the court was drawing exactly the distinction that Amazon makes between services that automatically publish content selected by users (which services do not engage in volitional conduct) and services that use automatic processes to themselves select content to copy in the first instance:

> In some of the cases cited by the plaintiffs, rather than having users upload the copyrighted material, the defendant took a volitional act, i.e., uploading the copyrighted work itself or using software to search for material to upload.  And in others, the courts explicitly recognized that their opinions did not apply to the situation where, as here, a website or internet facility uploads material automatically at the direction of a user.  Thus, none of these cases are applicable here, where, as in *Netcom*, the internet system allows users to automatically upload or download copyright material.

*Hotfile*, 798 F. Supp. 2d at 1308 (citations omitted).[6]

Even the portion of *Zillow* on which WSI relies—which, in any event, involved human moderators—falls into the same category.  As Amazon explained in its opening brief, the Ninth Circuit held that Zillow did not engage in volitional conduct when it used automated "trumping" rules that automatically displayed on Zillow's "Listing Platform" certain third party-submitted photographs but not others when multiple third parties submitted the same photograph.  WSI points to a different portion of

---

[5] And, in any event, *Tasini* was not about the volitional conduct requirement, but whether publishers who had licensed the right to print certain articles in their newspapers and magazines also had the right to publish the articles in a third-party electronic database.

[6] WSI also relies on the majority's opinion in *Aereo*, but the Court found infringement in that case due to Aereo's functional similarity to a cable TV system, and expressly declined to address how the Copyright Act "will apply to technologies not before the Court," including "questions involving cloud computing, remote storage DVRs, and other novel issues."  *Aereo*, 573 U.S. at 450 (alterations and quotations omitted).

the Court's opinion, analyzing a different part of Zillow's website called Digs.  With respect to Digs, photographs were either (1) "selected manually or electronically *by Zillow*" to be displayed on Digs or (2) uploaded by users to Digs.  *Zillow*, 918 F.3d at 740 (emphasis added).  For user uploads, users uploaded photographs to a "personal board," which was "typically private," though users could share a link to their boards.  *Id.* at 737.  The user's upload caused the photograph to "join[] a queue for review by a Zillow moderator," and that moderator then decided "***whether*** to designate the photo for tagging so that it can be searchable on Digs, ***and thus select it for public display***." [7]  *Id.* (emphasis added).  Accordingly, when users did decide to upload the photographs to their boards, it was ***a Zillow moderator*** who decided that they should also be accessible through Zillow's search function.  That is very different from a situation where, as a here, a user uploads a copyrighted photograph with the purpose that it end up displayed on a particular page, and it is then in fact displayed on that page without human intervention.

***Third***, WSI argues that Amazon is attempting to backdoor an intent requirement into direct copyright liability claims.  Opp'n at 17-18.  It isn't.  Amazon argues that the automatic copying and display of photographs uploaded by users is not volitional conduct because those fully automated process do not make Amazon (as opposed to the user) the "direct cause" of the infringement.  *Giganews, Inc.*, 847 F.3d at 666-67.  Indeed, if anything it is WSI that is trying an end-run around the traditional distinction between direct and secondary liability so it can avoid having to prove the elements of a secondary liability claim.

In sum, WSI alleges only that Amazon's software automatically and without any human intervention, copies and displays WSI's copyrighted photographs when those photographs are uploaded to Amazon's system by Amazon's users.  Those allegations may show direct infringement by Amazon's users, but they do not show direct infringement by Amazon.  WSI's copyright infringement claim

---

[7] While not discussed in the court's opinions, the parties' briefs suggest that some photographs on Digs were part of an "initial launch set," whereby Zillow identified photographs from the Listing Platform that it decided to add to Digs.  *See also* Principal and Response Br. of Plaintiff-Appellee/Cross-Appellant, *VHT, Inc. v. Zillow Grp.*, No. 17-35587, 2017 WL 6371641, at *7-8 (9th Cir. Dec. 11, 2017).

1    therefore fails as a matter of law.[8]

2    **B.    WSI's Claim Should Also Be Dismissed Under Section 512(c) of the DMCA**

3    **1.    WSI has pled only storage at the direction of the user.**

4    WSI does not—and cannot—dispute that a service's activities are considered to be "storage [] at

5    the direction of a user" under Section 512(c) of the DMCA if they are "accessibility-enhancing." *Mavrix*

6    *Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1052, 1056 n.12 (9th Cir. 2017).  Accessibility-

7    enhancing activities covered by the safe harbor include "software functions performed for the purpose of

8    facilitating access to user-stored material." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 39 (2d Cir.

9    2012); *see also Mavrix Photographs*, 873 F.3d at 1056 (accessibility-enhancing activities include

10   "software processes that automatically occur when a user uploads materials").

11   WSI would narrow "accessibility-enhancing activities" to those that "improve the formatting of

12   the content as it is being uploaded" or "highlight content already automatically uploaded."  Opp'n at 20.

13   To be sure, both are examples of activities covered by the DMCA safe harbor.  *See, e.g.*, *UMG*

14   *Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1020 (9th Cir. 2013); *Viacom Int'l,*

15   *Inc.*, 676 F.3d at 40 .  But no court has adopted WSI's distinction between "highlight[ing]" post-

16   publication and "active involvement ***prior to publication***," Opp'n at 21 (emphasis in original), where the

17   so-called "active involvement" was fully automated.

18   To the contrary, the Ninth Circuit in *Mavrix* recognized that "automatic and limited manual

19   activities" fall within the DMCA safe harbor, without limiting its holding to "automatic and limited

20   manual activities" that occur after publication.  *Mavrix*, 873 F.3d at 1056; *accord UMG v. Shelter*

21   *Capital Partners*, 718 F.3d 1006, 1020 (9th Cir. 2013) (applying the DMCA safe harbor to a video

22   hosting site despite the fact that it used automated software to process the videos:  "Veoh has simply

23   established a system whereby software automatically processes user-submitted content and recasts it in a

24   format that is readily accessible to its users. Veoh does not actively participate in or supervise file

25

---

26   [8] WSI cannot rely on Amazon's patent to fill the holes in its complaint.  WSI does not allege that
     Amazon actually does what the patent describes.  To the contrary, its allegations are often ***directly***
27   ***contrary*** to what is disclosed in the patent.  The allegations in WSI's complaint—and not the rank
     speculation in WSI's briefs—control here.  *See, e.g.*, *Verse Two Props., LLC v. MedPlast Fremont, Inc.*,
28   No. 5:14-CV-03765-EJD, 2015 WL 6955133, at *6 (N.D. Cal. Nov. 10, 2015).

uploading, nor does it preview or select the files before the upload is completed. Rather, this 'automated process' for making files accessible is initiated entirely at the volition of Veoh's users.") (citations, quotations, and alterations omitted).  "[E]xtensive, manual, and substantive activities" may not fall under the safe harbor (depending on the facts), *Mavrix*, 873 F.3d at 1056, but WSI has not alleged that Amazon engages in any "manual activities," extensive or otherwise.

### 2. WSI is estopped from arguing that something other than Amazon's algorithmic, photograph-uploading process removes it from the DMCA safe harbor.

WSI claims that Amazon's motion to dismiss under the DMCA is "procedurally deficient" because it must establish "*every* element of that defense" on the face of the complaint.  Opp'n at 19.  But WSI is judicially estopped from contending that Amazon's DMCA safe harbor defense fails for some reason other than the fact that Amazon's software automatically displays some but not all user-submitted photographs.  Specifically, in seeking leave to amend, WSI argued that it could not have brought its claims earlier because it previously believed that any claim would be barred by the DMCA:  "Prior to filing this litigation, WSI was under the mistaken impression that third-party sellers were the ones publishing WSI's images on the Amazon marketplace with Amazon acting as no more than a service provider, *eligible for DMCA protection*.  Accordingly, WSI did not include copyright infringement claims in its original Complaint, instead enforcing its rights in copyrighted images by sending takedown notices to Amazon."  Williams-Sonoma, Inc.'s Mot. for Leave To File Second Supp. Compl. (Dkt. 93) at 1.  This was not a stray couple of sentences, but the core of WSI's diligence argument.  *See, e.g.*, *id.* ("This editorial control, and Amazon's role in the selection and display of copyrighted images via its algorithms, *constitutes the volition required for direct copyright infringement and renders Amazon ineligible for safe harbor protection under the DMCA*."); *id.* at 4 ("WSI now knows the present reality of Amazon's control over product listings precludes it from invoking the DMCA safe harbor here."). And the Court relied on this argument in granting WSI leave to amend.  *See* Order Granting Pl.'s Mot. for Leave To File Sec. Am. Compl. and Denying Pl.'s Administrative Mot. to Seal (Dkt. 105) at 7-8.

In other words, WSI argued that Amazon satisfied *all* of the DMCA's other requirements; thus, under WSI's winning theory, WSI could not have pled a copyright claim until it learned about Amazon's use of automated software because Amazon's conduct would be protected by the DMCA safe harbor.

Having secured leave to amend on the grounds that it could not plausibly allege that Amazon failed to satisfy the DMCA's requirements for any reason *other than* the role of Amazon's software in the display of photographs on its website, WSI cannot now turn around and argue that the Court should deny Amazon's motion to dismiss for a different reason. *See Interstate Fire & Cas. Co., an Illinois Corp. v. Underwriters at Lloyd's, London*, 139 F.3d 1234, 1239 (9th Cir. 1998), *as amended* (May 13, 1998) (judicial estoppel "precludes a party from taking inconsistent positions in the same litigation" when the court has relied on the party's previous inconsistent statement).

### 3. WSI has not plausibly alleged that the operation of Amazon's software gives it the "right and ability to control" users' infringement.

WSI argues that Amazon had the "right and ability to control" users' infringement, which would remove Amazon from the protection of the Section 512(c) safe harbor, because Amazon "solely determines the layout, appearance and even the selection of content on the product pages" and "provides thousands of pages of seller guidance as to the nature of acceptable content."[9] Opp'n at 23; *see also* 17 U.S.C. § 512(c)(1)(B).  But WSI's copyright claim is not about the overall layout of the product page, or even most of the contents of the product page; it is solely about the appearance on the page of a particular picture of peppermint bark.  Further, as noted above, WSI cannot point to the pages of seller guidance that Amazon provides as a reason why it is not entitled to the safe harbor, in light of the arguments that it made in convincing the Court to grant it leave to amend.  Instead, the *only* question is whether the fact that Amazon's software automatically publishes certain photographs submitted by users but not others constitutes the "right and ability to control" its users' infringement, as that term is the used in the DMCA.

It does not.  An online service has the "right and ability to control" users' infringement only where it "exert[s] substantial influence on the activities of users."  *Shelter Capital Partners*, 718 F.3d at 1030.  WSI is correct that a service provider can have the right and ability to control if it manually "prescreens" content, but the type of fully automated process that WSI alleges here is not manual "prescreening."  *Mavrix*, 873 F.3d at 1058 (citing *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.

---

[9] An online service is removed from the DMCA safe harbor only if it has *both* the "right and ability to control" infringing activity *and* "receives a financial benefit directly attributable to the infringing activity."  17 U.S.C. § 512(c)(1)(B).  Because WSI has not alleged that Amazon has the "right and ability to control," the Court need not consider whether WSI has alleged a "financial benefit."

Supp. 2d 1146, 1173, 1182 (C.D. Cal. 2002)).  Rather, the Ninth Circuit was referring to the actions taken by the service provider in *Cybernet*, which "ha[d] a ***monitoring*** program in place" including "detailed policing" of its users.  *Cybernet Ventures*, 213 F. Supp. 2d at 1178 (emphasis added).  That is a far cry from an algorithm that automatically shows some, but not all, photographs submitted by users.

First, a court has previously found, as a matter of law, that Amazon does ***not*** have the right and ability to control users' infringement of copyrighted photographs.  *See Milo & Gabby, LLC v. Amazon.com, Inc.*, No. C13-1932RSM, 2015 WL 4394673, at *9 (W.D. Wash. July 16, 2015).

Second, Courts have found no right and ability to control where the service provider had far more influence than Amazon is alleged to have here.  For example, in *Capital Records, LLC v. Vimeo, LLC*, the Court found no right and ability to control as a matter of law where:  (1) Vimeo had guidelines prohibiting "unoriginal" and several other types of content; (2) Vimeo's (human) employees "enforce[d] the[] content restrictions with the aid of Moderator Tools," including affirmative searches by those same employees for certain types of content; (3) Vimeo staff exercised "significant discretion to manipulate the visibility" of website content; and (4) Vimeo employees "communicated directly with some of its users regarding content, ***at times suggesting to them that it would tolerate the uploading of copyrighted material***."  972 F. Supp. 2d 500, 528, 529 (S.D.N.Y. 2013), *overruled in part on other grounds*, 826 F.3d 78 (2d Cir. 2016) (emphasis added).  As the court explained, "[w]hile Vimeo's monitoring program aims to filter from the Website content that veers from its mission to provide a platform for user-created 'creative works and personal moments,' it does not purport to, and in practice does not, exert substantial influence over the content of the uploaded material."  *Id.* at 529.  The same is true of Amazon's alleged activities here.

Accordingly, WSI has failed to allege that Amazon has the "right and ability" to control its users' uploads of infringing photographs, and the DMCA safe harbor applies.

## III.   CONCLUSION

For the foregoing reasons, Amazon respectfully requests that the Court grant its motion to dismiss, with prejudice.

Dated:  June 10, 2020

DURIE TANGRI LLP

By: _____/s/ Mark A. Lemley_____
DARALYN J. DURIE
MARK A. LEMLEY
JOSEPH C. GRATZ
ALLYSON R. BENNETT
MATTHAEUS MARTINO-WEINHARDT
PETER S. HORN

Attorneys for Defendant
AMAZON.COM, INC.

AMAZON.COM, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED AND
SUPPLEMENTAL COMPLAINT / CASE NO. 3:18-CV-07548-AGT

1

## **CERTIFICATE OF SERVICE**

2          I hereby certify that on June 10, 2020 the within document was filed with the Clerk of the Court

3   using CM/ECF which will send notification of such filing to the attorneys of record in this case.

4

5                                                                      /s/ *Mark A. Lemley*
                                                          DARALYN J. DURIE
6                                                         MARK A. LEMLEY
                                                          JOSEPH C. GRATZ
7                                                         ALLYSON R. BENNETT
                                                   MATTHAEUS MARTINO-WEINHARDT
8                                                         PETER S. HORN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AMAZON.COM, INC.'S REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED AND
SUPPLEMENTAL COMPLAINT / CASE NO. 3:18-CV-07548-AGT